# EXHIBIT A

# SHOPPING CENTER LEASE

Shopping Center: _____ Carriage Plaza Shopping Center _____
Landlord: _____ Danbury Partners, Ltd _____
Tenant: _____ Texas Holdings Firm Corporation _____

## INDEX TO LEASE

| ARTICLE | TITLE | PAGE |
|---|---|---|
| ARTICLE 1 | DEFINITIONS AND CERTAIN BASIC PROVISIONS | 2 |
| ARTICLE 2 | GRANTING CLAUSE | 3 |
| ARTICLE 3 | DELIVERY OF PREMISES | 3 |
| ARTICLE 4 | RENT | 3 |
| ARTICLE 5 | SALES REPORTS, RECORDS AND FINANCIAL STATEMENTS | 4 |
| ARTICLE 6 | TENANT'S RESPONSIBILITY FOR TAXES, OTHER REAL ESTATE CHARGES AND INSURANCE EXPENSES | 4 |
| ARTICLE 7 | COMMON AREA | 4 |
| ARTICLE 8 | INTENTIONALLY DELETED | 6 |
| ARTICLE 9 | USE AND CARE OF DEMISED PREMISES | 6 |
| ARTICLE 10 | MAINTENANCE AND REPAIR OF DEMISED PREMISES | 7 |
| ARTICLE 11 | ALTERATIONS | 8 |
| ARTICLE 12 | LANDLORD'S RIGHT OF ACCESS | 8 |
| ARTICLE 13 | SIGNS; STORE FRONTS | 8 |
| ARTICLE 14 | UTILITIES | 9 |
| ARTICLE 15 | INSURANCE COVERAGES | 9 |
| ARTICLE 16 | WAIVER OF LIABILITY; MUTUAL WAIVER OF SUBROGATION | 10 |
| ARTICLE 17 | DAMAGES BY CASUALTY | 11 |
| ARTICLE 18 | EMINENT DOMAIN | 12 |
| ARTICLE 19 | ASSIGNMENT AND SUBLETTING | 12 |
| ARTICLE 20 | SUBORDINATION; ATTORNMENT; ESTOPPELS | 13 |
| ARTICLE 21 | DIRECTION OF TENANT'S ENERGIES | 13 |
| ARTICLE 22 | DEFAULT BY TENANT AND REMEDIES | 14 |
| ARTICLE 23 | LANDLORD'S CONTRACTUAL SECURITY INTEREST | 16 |
| ARTICLE 24 | HOLDING OVER; SURRENDER OF PREMISES | 16 |
| ARTICLE 25 | NOTICES | 17 |
| ARTICLE 26 | INTENTIONALLY DELETED | 17 |
| ARTICLE 27 | AMERICANS WITH DISABILITIES ACT | 17 |
| ARTICLE 28 | REGULATIONS | 17 |
| ARTICLE 29 | MISCELLANEOUS | 18 |

# SHOPPING CENTER LEASE

### ARTICLE 1

### DEFINITIONS AND CERTAIN BASIC PROVISIONS

1.1     The following list sets out certain defined terms and certain financial and other information pertaining to this lease:

(a)     "Landlord": _____ Danbury Partners, Ltd. _____

(b)     Landlord's address: _____ 510 Hearn St,     Austin, TX  78703 _____

(c)     "Tenant": _____ Texas Holdings Firm Corporation _____

(d)     Tenant's address: _____ 1700 Lincoln Street, Denver, CO 80203 _____

(e)     Tenant's trade name: _____ Sports Zone  GA _____

(f)     Tenant's Guarantor _____

(g)     Landlord's "Agent": _____ Mark Lanier _____

(h)     Intentionally deleted

(i)     "Shopping Center": Landlord's property "Carriage Plaza", located at the southeast quadrant of Collins/Copeland and I-30 in the City of Arlington, Tarrant County , Texas, which property is described or shown on Exhibit "A" attached to this lease. With regard to Exhibit "A", the parties agree that the exhibit is attached solely for the purpose of locating the Shopping Center and the Demised Premises within the Shopping Center and that no representation, warranty, or covenant is to be implied by any other information shown on the exhibit (i.e., any information as to buildings, tenants or prospective tenants, etc. is subject to change at any time).

(j)     "Demised Premises": a store unit in the Shopping Center containing approximately  4,327 square feet in area (measured by calculating lengths and widths to the exterior of outside walls and to the center of interior walls), being shown on Exhibit "B" attached to this lease, together with all easements, rights and privileges appurtenant thereto.

(k)     Intentionally deleted

(l)     "Commencement Date": One hundred and twenty (120) days after  the full execution of this lease.

(m)     Lease Term: Commencing on the Commencement Date and continuing for ___ Sixty ___ months; provided that if the Commencement Date is a date other than the first day of a calendar month, the lease term  will be for the number of months specified above plus the remainder of the calendar month in which the Commencement Date occurs.

(n)     Minimum guaranteed rent: Tenant must pay to Landlord the minimum Guaranteed Rent per square foot per year, paid per month, per the schedule below beginning on the Commencement Date.

|  |  |  |
|---|---|---|
| Months 01 - 06: | $  0.00/square foot or | $ 0.00/month |
| Months 07 - 12: | $ 12.00/square foot or | $ 4,327.00/month |
| Months 13 - 24: | $ 13.50/square foot or | $ 4,867.87/month |
| Months 25 - 36: | $ 14.50/square foot or | $ 5,228.45/month |
| Months 37 - 48 | $ 16.00/square foot or | $ 5,769.33/month |
| Months 49 - 60: | $ 17.00/square foot or | $ 6,129.92/month |

(o)     Percentage rent rate: _____ N/A _____%.

(p)     Initial Common area maintenance charge: A minimum of $ ___ 1.84 ___ per square foot per year paid per month, payable in advance.

(q)     Initial escrow payment for taxes: A minimum of $ ___ 2.59 ___ per square foot per year paid per month, payable in advance.

(r)     Initial payment for insurance: A minimum of $ ___ 0.34 ___ per square foot per year paid per month, payable in advance.

(s)     Prepaid rent: N/A

(t)     Security deposit: $ 6,046.98, due and payable at Tenant's execution of Lease.

(u)     Permitted use: Tenant shall use and occupy the Demised Premises solely for the following purpose(s): the retail sale of athletic apparel and accessories. Tenant acknowledges that the above specification of a "permitted use" means only that Landlord has no objection to the specified use and does not include any representation or warranty by Landlord as to whether or not such specified use complies with applicable laws and/or requires special governmental permits. In this regard Tenant acknowledges that this Section 1.1(u) is subject to Article 3 and Section 9.9 of this lease. Landlord grants Tenant exclusive rights to the Permitted Use within the 934 Copeland building and will not lease to any other Tenant for this Permitted Use within this building. Tenant acknowledges that the 2 story building located at 900 Copeland Road and a part of the Carriage Plaza shopping center is not covered by this exclusive use provision.

(v)     Tenant's Proportionate Share: A percentage, the numerator of which is the number of square feet in the Demised Premises and the denominator of which is the number of square feet in the Shopping Center to which the percentage relates. Notwithstanding the above, as to charges for which such percentage, when applied uniformly, would have an inequitable result, Landlord will determine the percentage that Landlord reasonably deems to be equitable. As an example, if the Shopping Center contains 150,000 square feet and the average annual bill for all dumpster service is $42,000.00, then a 10,000 square foot Tenant's Proportionate Share of that bill would be $2,800.00 ($42,000.00 x [10,000 ) 150,000]). If that same tenant were to separately contract for its dumpster service and the result was that the cost of the dumpster service decreased to $38,000.00, (i.e., the cost of providing such service to the tenant were $4,000.00 instead the $2,800.00 otherwise allocated, due to such tenant=s frequency and size of pick-up), then notwithstanding that such tenant did not

separately contract for dumpster service, Landlord would require that it pay $4,000.00 toward such service (an increase of approximately 43%), thereby decreasing the proportionate share for the remainder of the tenants of the Shopping Center (for example, a 2,000 square foot tenant=s share would be reduced from $546.00 ($42,000.00 x [2,000 ) 150,000]) to $532.00 ($38,000.00 x [2,000 ) 140,000]).

1.2     The following chart is provided as an estimate of Tenant's initial monthly payment broken down into its components. This chart, however, does not supersede the specific provisions contained elsewhere in this lease:

| | |
|---|---|
| Initial Minimum Guaranteed Rent<br>(Section 1.1(n) and Section 4.1) | $ 4,327.00 |
| Initial Common Area Maintenance Charge<br>(Sections 1.1 (p) and 7.4) | $ 663.47 |
| Initial Escrow Payment for Taxes and Other Real Estate Charges<br>(Section 1.1(q) and Article 6) | $ 933.91 |
| Initial Escrow Payment for Insurance Expenses<br>(Section 1.1(r)Article 6) | $ 122.60 |
| Initial Payment for Merchant=s Association/Promotional Fund<br>(Article 8) | $ N/A |
| Total Initial Monthly Payment | $ 6,046.98 |

## ARTICLE 2

### GRANTING CLAUSE

Landlord leases the Demised Premises to Tenant upon the terms and conditions set forth in this lease.

## ARTICLE 3

### DELIVERY OF PREMISES

3.1     The Demised Premises is being leased "AS IS," with Tenant accepting all defects, if any; and Landlord makes no warranty of any kind, express or implied, with respect to the Demised Premises (without limitation, Landlord makes no warranty as to the habitability, fitness or suitability of the Demised Premises for a particular purpose). This Article 3 is subject to any contrary requirements under applicable law; however, in this regard Tenant acknowledges that it has been given the opportunity to inspect the Demised Premises and to have qualified experts inspect the Demised Premises prior to the execution of this lease.

3.2     Notwithstanding the provisions of this Article 3, Landlord will ensure that exterior electrical connection is supplied to the Demised Premises in good working condition, any changes to the interior electrical wiring will be at Tenant's expense. Landlord will warrant operation of the HVAC unit for the first twelve (12) months following Lease Commencement. Any changes to the currently existing HVAC duct work required due to interior reconfiguration will be performed by Tenant at Tenant's expense.

## ARTICLE 4

### RENT

4.1     Rent accrues from the Commencement Date, and is payable to Landlord, at Landlord's address.

4.2     Tenant must pay to Landlord minimum guaranteed rent in monthly installments in the amounts specified in Section 1.1(n) of this lease. The first such monthly installment is due and payable 180 days after Lease execution, and subsequent installments are due and payable on or before the first day of each succeeding calendar month during the lease term following the Commencement Date; provided that if the Commencement Date is a date other than the first day of a calendar month, Tenant must pay on or before such date as minimum guaranteed rent for the balance of such calendar month a sum equal to that proportion of the rent specified for the first full calendar month as herein provided, which the number of days from the Commencement Date to the end of the calendar month during which the Commencement Date falls bears to the total number of days in such month.

4.3     It is understood that the minimum guaranteed rent is payable on or before the first day of each calendar month (in accordance with Section 4.1 and Section 4.2 above) without offset or deduction of any nature, except as otherwise set forth herein, or as provided under applicable law. In the event any rent or other amount owed to Landlord (including, without limitation, any amounts owed under the terms of this Article 4, or under Article 6, Article 7, or Article 8 below) is not received by Landlord before the date which is 10 days after such amount's due date, for any reason whatsoever, or if any payment for such an amount is by check which is returned for insufficient funds, then in addition to the past due amount, Tenant must pay to Landlord one of the following (the choice to be at the sole option of the Landlord unless one of the choices is improper under applicable law, in which event the other alternative will automatically be deemed to have been selected): (a) a late charge in an amount equal to ten percent (10%) of the rent or other amount then due, in order to compensate Landlord for its administrative and other overhead expenses; or (b) interest on the rent or other amount then due at the maximum contractual rate which could legally be charged in the event of a loan of such amount to Tenant (but in no event to exceed 12% per month), such interest to accrue continuously on any unpaid balance during the period commencing with the due date of such rent or other amount and terminating with the date on which Tenant makes full payment of all amounts owing to Landlord at the time of such payment. Any such late charge or interest payment is payable as additional rent under this lease and is payable immediately on demand. If any payment for rent or other amount owed to Landlord (including, without limitation, any amounts owed under the terms of this Article 4, or under Article 6, Article 7, or Article 8 below) is by check which is returned for insufficient funds, Tenant must immediately make the required payment to Landlord in good funds; moreover, Tenant must also pay to Landlord all other amounts specified by the terms of this lease (including, without limitation, interest or other charges required under the terms of this Article 4, or under Article 6, Article 7, or Article 8 below), plus an additional fee of $50.00 to compensate Landlord for its expense and effort in connection with the dishonored check.

4.4     If Tenant fails in two consecutive months to make rent payments within ten days after they are due, Landlord, in order to reduce its administrative costs, may require, by giving written notice to Tenant (in addition to any late charge or interest accruing pursuant to Section 4.3 above, as well as any other rights and remedies accruing pursuant to Article 22 below, or any other provision of this lease or at law), that minimum guaranteed rents are to be paid quarterly in advance instead of monthly and that all future rent payments are to be made on or before the due date by cash, cashier's check or money order and that the delivery of Tenant's personal or corporate check

will no longer constitute a payment of rent as provided in this lease. Any acceptance of a monthly rent payment or of a personal or corporate check thereafter by Landlord cannot be construed as a subsequent waiver of such rights.

## ARTICLE 5

### SALES REPORTS, RECORDS AND FINANCIAL STATEMENTS

5.1     Within ten (10) business days after a request from Landlord (but not more frequently than quarterly) during the term of this lease, Tenant must prepare and deliver to Landlord at the place where rent is then payable a statement of gross sales made from the Demised Premises during the preceding quarter. Tenant must furnish similar statements for its licensees, concessionaires and subtenants, if any. Tenant acknowledges Landlord's concern for prompt, accurate sales records and financial reports, inasmuch as those records enable Landlord to monitor the success of the Shopping Center.

5.2     Tenant must, within ten (10) business days after a request from Landlord (but not more than once per calendar year), deliver to Landlord such financial statements as are reasonably required by Landlord to verify the net worth of Tenant and any guarantor of Tenant's obligations under this lease (including, without limitation, a balance sheet showing the then-current net worth of Tenant together with a profit and loss statement for the most current fiscal year of Tenant). Such statements must be certified to be correct by an officer of Tenant or an independent certified public accountant and must be prepared in accordance with generally accepted accounting principles. In the event that Tenant is a subsidiary comprising only the operations conducted at the Demised Premises, Tenant must also provide such statements from the parent company or larger business of which Tenant is a part. In the event that Tenant is an individual, the financial statements must be prepared in accordance with generally accepted accounting standards governing personal financial statements and include all assets and liabilities of the individual, including the operations conducted at the Demised Premises as well as all other business activities. In lieu of financial statements, Landlord may request the individual=s most recent federal income tax return.

5.3     Landlord must use reasonable good faith efforts to keep confidential all sales reports, records and financial statements supplied by Tenant; however, Landlord has the right to reveal such information to mortgages, prospective purchasers and mortgagees (and agents in such regard) and to Landlord's own managerial and administrative staff and consultants.

## ARTICLE 6

### TENANT'S RESPONSIBILITY FOR TAXES, OTHER
### REAL ESTATE CHARGES AND INSURANCE EXPENSES

6.1     Tenant is liable for all taxes levied against personal property and trade fixtures placed by Tenant in the Demised Premises. If any such taxes are levied against Landlord or Landlord's property and if Landlord elects to pay the same or if the assessed value of Landlord's property is increased by inclusion of personal property and trade fixtures placed by Tenant in the Demised Premises and Landlord elects to pay the taxes based on such increase, Tenant must pay Landlord upon demand that part of such taxes for which Tenant is primarily liable hereunder.

6.2     Tenant is also liable for "Tenant's Proportionate Share" (as defined in Section 1.1(u) above) of all "real estate charges" (as defined below) and "insurance expenses" (as defined below) related to the Shopping Center or Landlord's ownership of the Shopping Center. Tenant's obligations under this Section 6.2 will be prorated during any partial year (i.e., the first year and the last year of the lease term). "Real estate charges" includes ad valorem taxes; general and special assessments; costs incurred in monitoring and disputing taxes, whether paid to an outside consultant or otherwise; parking surcharges; any tax or excise on rents; any tax or charge for governmental services (such as street maintenance or fire protection); and any tax or charge which replaces any of such above described "real estate charges"; provided, however, that "real estate charges" does not include any franchise, estate, inheritance or general income tax. "Insurance expenses" includes all premiums and other expenses incurred by Landlord for commercial liability insurance and Special Form or similar property insurance (plus whatever endorsements or special coverages which Landlord, in Landlord's sole discretion, may consider appropriate).

6.3     Landlord may, from time to time, make monthly or other periodic charges based upon the estimated annual total of all real estate charges and insurance expenses and direct that Tenant prepay monthly a pro rata portion of the prospective future payment (i.e., the prospective future payment divided by the number of months before the prospective future payment will be due). Tenant agrees that any such prepayment directed by Landlord is due and payable monthly on the same day that minimum guaranteed rent is due and is subject to adjustment at the end of the year on the basis of the actual real estate charges and insurance expenses for such year.

6.4     Tenant agrees that, as between Tenant and Landlord, Landlord has the sole and absolute right to contest taxes levied against the Demised Premises and the Shopping Center (other than taxes levied directly against Tenant's personal property within, or sales made from, the Demised Premises). Therefore, Tenant, to the fullest extent permitted by law, irrevocably waives any and all rights that Tenant may have to receive from Landlord a copy of notices received by Landlord regarding the appraisal or reappraisal, for tax purposes, of all or any portion of the Demised Premises or the Shopping Center (including, without limitation, any rights set forth in '41.413 of the Texas Property Tax Code, as such may be amended from time to time). Additionally, Tenant, to the fullest extent permitted by law, hereby irrevocably assigns to Landlord any and all rights of Tenant to protest or appeal any governmental appraisal or reappraisal of the value of all or any portion of the Demised Premises or the Shopping Center (including, without limitation, any rights set forth in '41.413 and '42.015 of the Texas Property Tax Code, as such may be amended from time to time). Tenant agrees without reservation that it will not protest or appeal any such appraisal or reappraisal before a governmental taxing authority without the express written authorization of Landlord.

## ARTICLE 7

### COMMON AREA

7.1     The term "Common Area" is defined for all purposes of this lease as that part of the Shopping Center intended for the common use of all tenants and the public which is maintained by Landlord or the expense of which is borne in whole or in part by Landlord, including among other facilities (as such may be applicable to the Shopping Center), parking areas, streets and alleys, common open spaces, landscaping, curbs, loading area, sidewalks and streetscapes, malls and promenades (enclosed or otherwise), lighting facilities, drinking fountains, meeting rooms, public toilets, and the like but excluding (i) space in buildings (now or hereafter existing) designated for rent for commercial purposes, as the same may exist from time to time, (ii) streets and alleys maintained by public authorities, (iii) areas within the Shopping Center which may from time to time not be owned by Landlord (unless subject to a cross-access or similar agreement benefitting the area which includes the Demised Premises), (iv) areas leased to a single-purpose user (such as a bank or a fast-food restaurant) where access is restricted, and (v) decorative awnings; provided, however, that if Landlord bears all or any portion of the cost of

maintaining, repairing, or replacing any of the areas described in clauses (ii) through (v) of the immediately-preceding sentence, such areas, while not technically constituting part of the Common Area, will be deemed included within the Common Area for the purposes of (1) Landlord's ability to prescribe rules and regulations regarding same, and (2) their inclusion for purposes of common area maintenance reimbursements. Landlord reserves the right to change from time to time the dimensions and location of the Common Area, as well as the dimensions, identities, locations and types of any buildings, signs or other improvements in the Shopping Center. For example, and without limiting the generality of the immediately preceding sentence, Landlord may from time to time substitute for any parking area other areas reasonably accessible to the tenants of the Shopping Center, which areas may be elevated, surface or underground.

7.2     Tenant, and its employees and customers, and when duly authorized pursuant to the provisions of this lease, its subtenants, licensees and concessionaires, have the nonexclusive right to use the Common Area as constituted from time to time, such use to be in common with Landlord, other tenants in the Shopping Center and other persons permitted by the Landlord to use the same, and subject to such reasonable rules and regulations governing use as Landlord from time to time may prescribe. For example, and without limiting the generality of Landlord's ability to establish rules and regulations governing all aspects of the Common Area, Tenant agrees as follows:

(a)     Tenant acknowledges Landlord's desire to provide retail customers of the Shopping Center with sufficient ground level parking space reasonably close to the retail stores. Accordingly, Tenant and Tenant's employees may park only in the areas designated by Landlord as employee parking areas in the Shopping Center. Tenant must furnish Landlord with a complete list of license numbers of all automobiles operated by Tenant, its contractors, employees, subtenants, licensees, and concessionaires, and their employees within five (5) days after the earlier to occur of the date Tenant takes possession of the Demised Premises or the Commencement Date of this lease. In addition, Tenant must deliver a current list to Landlord within five (5) days after Landlord requests such a list, either verbally or in writing, from Tenant=s store manager (provided, however, that Landlord cannot make such a request more often than once each quarter plus once in connection with the Christmas shopping season) and Tenant=s store manager must confirm immediately to Landlord=s security personnel whether or not a particular vehicle is owned or operated by Tenant, its employees, subtenants, licensees, concessionaires or their employees. Tenant agrees that if any automobile or other vehicle owned by Tenant or any of its employees, its subtenants, its licensees or its concessionaires, or their employees, at any time is parked in any part of the Shopping Center other than the areas designated by Landlord for employee parking, Tenant must pay to Landlord as additional rent upon demand an amount equal to the daily rate or charge for such parking as established by Landlord from time to time for each day, or part thereof, that such automobile or other vehicle is so parked (currently, $10.00 for the first violation and $50.00 for each violation thereafter) from time to time for each day, or part thereof, that such automobile or other vehicle is so parked. In addition, Tenant must immediately remove the vehicle to parking areas specified above as being permitted parking areas for Tenant and its employees. If Tenant fails to respond immediately, Landlord has the right to remove the vehicle to such location or to a location away from the Shopping Center; and Tenant must reimburse Landlord, upon demand and as additional rent, for all costs and expenses Landlord incurs in taking such action and hereby indemnifies Landlord and agrees to hold Landlord harmless from all liabilities which may arise out of Landlord's action. In addition to the rights granted by the preceding sentences, any violation of this Section, whether by Tenant or by one of Tenant's employees, entitles Landlord to exercise at its option any one or more of the remedies which are authorized in <u>Article 22</u> of this Lease.

(b)     Tenant is not permitted to solicit business, or distribute leaflets or other material in the Common Area nor take any action which in the sole and exclusive judgment of Landlord would constitute a nuisance or would disturb, endanger, or interfere with the rights of other persons to use the Common Area or would tend to injure the reputation of the Shopping Center.

(c)     Landlord may temporarily close any part of the Common Area for such periods of time as may be necessary to make repairs or alterations or to prevent the public from obtaining prescriptive rights.

(d)     With regard to the roof(s) of the building(s) in the Shopping Center, use of the roof(s) is reserved to Landlord or, with regard to any tenant demonstrating to Landlord's satisfaction a need to use same, to such tenant after receiving prior written consent from Landlord.

(e)     Landlord may seasonally place kiosks or allow the placement of vending carts in and around the Common Area in accordance with applicable governmental laws, rules and regulations.

7.3     Landlord is responsible for the operation, management and maintenance of the Common Area, the manner of maintenance and the expenditures therefore to be in the sole discretion of Landlord, but to be generally in keeping with similar Shopping Centers within the same geographical area as the Shopping Center. **LANDLORD MAKES NO REPRESENTATION OR WARRANTY REGARDING WHETHER OR NOT LANDLORD WILL PROVIDE SECURITY SERVICES OR, IF LANDLORD DOES ELECT TO PROVIDE SECURITY SERVICES, WHAT FORM OF SECURITY SERVICES WILL BE PROVIDED.**

7.4     In addition to the rents and other charges prescribed in this lease, Tenant must pay to Landlord Tenant's Proportionate Share of the cost of operation and maintenance of the Common Area which may be incurred by Landlord in its discretion, including, among other costs, those for lighting, painting, cleaning, landscaping (including landscaping of any common open spaces maintained by Landlord or for whose maintenance Landlord pays), parking (including valet parking), policing (to the extent, if any, that security is provided by or otherwise arranged for by Landlord), seasonal decoration, inspecting, repairing, replacing, and, if there is an enclosed mall, promenade or accessway through any building in the Shopping Center, heating and cooling of such enclosed mall, promenade, or accessway; operation of the central portion and water lines of any split heating, air conditioning and ventilating systems; trash removal for the Common Area (to the extent not covered by the terms of <u>Section 9.6</u> below), all materials, supplies and services purchased or hired in connection with the operation of the Common Area; compensation and benefits paid to any and all personnel related to the operation of the Common Area, including, without limitation, security and maintenance persons, secretaries, bookkeepers and other personnel; management fees charged for management of the Shopping Center; an overhead administrative cost allowance, and the cost of any insurance for which Landlord is not reimbursed pursuant to <u>Section 6.2</u>, but specifically excluding all expenses paid or reimbursed pursuant to <u>Article 6</u>. With regard to capital expenditures (i) the original investment in capital improvements (i.e., upon the initial construction of the Shopping Center) cannot be included, and (ii) improvements and replacements, to the extent capitalized on Landlord's records may be included only to the extent of a reasonable depreciation or amortization (including interest accruals commensurate with Landlord's interest costs). If this lease should commence on a date other than the first day of a calendar year or terminate on a date other than the last day of a calendar year, Tenant's reimbursement obligations under this <u>Section 7.4</u> will be prorated based upon Landlord's expenses for the entire calendar year. Tenant must make such payments to Landlord on demand, at intervals not more frequent than monthly. Landlord may at its option make monthly or other periodic charges based upon the estimated annual cost of operation and maintenance of the Common Area, payable in advance but subject to adjustment after the end of the year on the basis of the actual cost for such year.

7.5     Within one hundred and twenty (120) days of the end of each calendar year ("Accounting Year"), Landlord shall deliver to Tenant an itemized breakdown certified as true and correct by an officer of Landlord showing the actual costs for Real estate charges, Insurance expenses, and Operating Expenses, together with copies of all bills for Real estate charges and Insurance expenses, and a "cost breakdown" of Operating Expenses. If Tenant's Proportionate Share of the actual costs for Real estate charges, Insurance expenses, and/or Operating Expenses exceeds the amount paid by Tenant in any Accounting Year, then within thirty (30) days after receipt of said tax bills and cost breakdown, Tenant shall pay to Landlord such excess amounts. If Tenant's Proportionate Share of the actual costs for Real estate charges, Insurance expenses, and/or Operating Expenses is less than Tenant's payments for any Accounting Year, Tenant shall receive a credit against Tenant's estimated share payable in the first month after receipt by Tenant of said tax bills and cost breakdown of the

immediately following Accounting Year, and such subsequent months as required to exhaust said credit, or if there is not time remaining in the Term to exhaust such credit, such excess shall be refunded to Tenant. If such information is not provided within such one hundred and twenty (120) day period, Landlord may not increase Tenant's estimated Proportionate Share of Real estate charges, Insurance expenses, or Operating Expenses until such information is provided to Tenant.

7.6    Tenant, its agents and accountants, shall have the right to examine and audit Landlord's books and records relating to any cost or item that is passed through to Tenant upon fifteen (15) business days written request by Tenant to Landlord. If Tenant disputes the accuracy of Landlord's certification, Tenant shall still pay the amount shown owing pending completion of the audit. If Tenant's audit of the books and records shows that the amounts shown on the statement are ten percent (10%) or more higher than the actual amount owed by Tenant under this Lease, Landlord shall, on demand, reimburse Tenant for all reasonable costs of conducting the audit. Any overpayment or underpayment of Real estate charges, Insurance expenses or Operating Expenses shall be adjusted by the parties within ten (10) business days after the audit is completed. Landlord shall keep complete and accurate books and records relating to Real estate charges, Insurance expenses and Operating Expenses, which records shall be kept in accordance with generally accepted accounting principles consistently applied.

## ARTICLE 8

Intentionally deleted

## ARTICLE 9

## USE AND CARE OF DEMISED PREMISES

9.1    Tenant must commence business operations in the Demised Premises on or immediately after the Commencement Date and must operate its business in an efficient, high class and reputable manner so as to produce the maximum amount of sales from the Demised Premises. Tenant must not at any time leave the Demised Premises vacant, but must in good faith continuously throughout the term of this lease conduct and carry on in the entire Demised Premises the type of business for which the Demised Premises is leased. Tenant must, except during reasonable periods for repairing, cleaning and decorating, keep the Demised Premises open to the public for business with adequate personnel in attendance on all days (including, if designated by Landlord, Sundays and holidays) and during all hours (including, if designated by Landlord, evenings) established by Landlord from time to time as business days and store hours for the Shopping Center (including, if designated by Landlord, extended days and hours during the shopping season prior to Christmas and whenever else that the majority of the retail tenants in the Shopping Center open for business during extended days or hours, or both), except to the extent Tenant may be prohibited from being open for business by applicable law, ordinance or governmental regulation. Landlord hereby notifies Tenant that the non-seasonal business days and store hours currently in effect for the Shopping Center are as follows: 10:00 a.m. to 6:00 p.m., Monday through Friday. Nothing in this lease prevents Tenant from being open during hours longer than those specified above. Tenant agrees that if Tenant fails to open for business as required in this Section 9.1, fails to operate its business during the days and hours required under the terms of this Section 9.1, or deserts or vacates the Demised Premises, then Tenant must pay monthly at the same time minimum guaranteed rent is due, as liquidated damages (it being understood and agreed that actual damages would be very difficult to assess, but such liquidated damages are a fair estimate of the actual damages), an amount equal to twenty-five percent (25%) of the minimum guaranteed rent payable for the month (or months) in which Tenant fails to be open for business as required under this lease (whether such failure is the failure to be initially open, the failure to operate during the required days and hours, or Tenant's desertion or vacation of the Demised Premises). The liquidated damages described above do not and cannot be deemed to limit Landlord's rights under Article 22 of this lease.

9.2    The Demised Premises may be used only for the purpose or purposes specified in Section 1.1(u) above, and only under the trade name specified in Section 1.1(e) above (or, if Section 1.1(e) is not filled in, any trade name approved in advance in writing by Landlord), and for no other purpose and under no other trade name, it being understood and acknowledged that Landlord has entered into this lease in large part because it believes that such use and trade name will benefit the Shopping Center as a whole.

9.3    Tenant must not keep anything within the Demised Premises or use the Demised Premises for any purpose which increases the insurance premium cost or invalidates any insurance policy carried on the Demised Premises or other parts of the Shopping Center. All property kept, stored or maintained within the Demised Premises by Tenant is at Tenant's sole risk. Similarly, Tenant must not bring onto or create within the Demised Premises or the Shopping Center any Hazardous Substances in violation of Environmental Laws (both as defined below). Tenant also must prohibit its employees, agents, contractors, or suppliers to bring onto or create within the Demised Premises or the Shopping Center any Hazardous Substances in violation of Environmental Laws. Tenant must immediately notify Landlord if Tenant suspects, discovers or receives notice of any violation of Environmental Laws at the Demised Premises or the Shopping Center and must cooperate with Landlord in identifying and investigating any such violation or suspected violation. Tenant further agrees to abide by the terms of any and all protocols, procedures and agreements of which Landlord gives Tenant written notice and which address the detection, management, or remediation of environmental or health hazards at the Demised Premises or the Shopping Center. Tenant agrees to reimburse Landlord upon demand and from time to time for all costs and expenses that Landlord incurs in connection with Tenant=s violation of any covenant set forth above. In addition, Tenant indemnifies Landlord and holds Landlord harmless from and against any and all liability, liens, claims, demands, damages, expenses, fees, costs, fines, penalties, suits, proceedings, actions and causes of action (including without limitation all attorneys' fees and expenses) arising out of or relating to, directly or indirectly, any violation or alleged violation by of the covenants set forth above. This indemnification shall extend for three years after the expiration of the Lease term and any extensions exercised by Tenant thereto. As used in this lease, the following definitions apply:

(A)    A Hazardous Substance @ means all hazardous and toxic substances, wastes or materials, including without limitation, hydrocarbons (including naturally occurring or man-made petroleum and hydrocarbon), flammable materials, explosives, urea formaldehyde insulation, radioactive materials, biologically hazardous substances, PCBs, pesticides, herbicides, and any other kind and/or type of pollutants or contaminants (including, without limitation,, asbestos and raw materials which include hazardous constituents), sewage sludge, industrial slag, solvents and/or any other similar substances or materials which, because of toxic, flammable, ignitable, explosive, corrosive, reactive, radioactive, or other properties may be hazardous to human health or the environment.

(B)    A Environmental Laws @ means any and all present and future applicable (i) federal, state and local statutes, laws, rules or regulations, including without limitation the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended by the Superfund Amendments and Reauthorization Act of 1986, the Resource Conservation and Recovery Act of 1976, as amended by the Used Oil Recycling Act of 1980, the Solid Waste Disposal Act Amendment of 1980, and the Hazardous and Solid Waste Amendments of 1984, the Texas Water Code and the Texas Solid Waste Disposal Act, (ii) judicial or administrative interpretations thereof, including any judicial or administrative orders or judgments, and (iii) ordinances, codes, plans, injunctions, decrees, permits, demand letters, concessions, grants, franchises, licenses, agreements, notices, or other governmental restrictions, relating to the protection of the public health, welfare, and the environment

9.4    Tenant must not conduct within the Demised Premises any fire, auction, bankruptcy, "going-out-of-business," "lost-our-lease" or similar sale; nor is Tenant permitted to operate within the Demised Premises a "wholesale" or "factory outlet" store, a cooperative

store, a "second hand" store, a "surplus" store, a store commonly referred to as a "discount house" or a catalogue sales store except of merchandise which Tenant is permitted to sell over-the-counter. Tenant shall not advertise that it sells products or services at a A discount@ Acut-price@ or Acut-rate prices.@ The purpose for this restriction is the maintenance of a first-class retail Shopping Center image, not price regulation; therefore, Landlord agrees that items may be sold, and on occasion be advertised as being sold, at discounted prices as long as Tenant complies with all applicable laws and maintains an image consistent with a first-class retail Shopping Center.

9.5     Tenant must not permit any objectionable or unpleasant noises or odors to emanate from the Demised Premises; nor place or permit any radio, television, loudspeaker or amplifier on the roof or outside the building or the Demised Premises or where the same can be seen or heard from outside the building; nor place any antenna, equipment, awning, fixture or other projection on the exterior of or above the Demised Premises; nor take any other action which would constitute a nuisance or would disturb or endanger other tenants of the Shopping Center or unreasonably interfere with their use of their respective demised premises; nor permit any unlawful or immoral practice to be carried on or committed on the Demised Premises; nor do anything which would tend to injure the reputation of the Shopping Center. In the event Tenant uses all or any portion of the Demised Premises for food preparation, Tenant must comply with all regulations and requirements of applicable health and safety authorities, including, if required by such authorities, installing an adequate grease trap (or verifying that the existing grease trap, if there is one, is adequate). Tenant must enter into a service contract for regular and frequent cleaning of any such grease trap so as to fully and sufficiently prevent any overflow of the grease trap and must actually arrange for the cleanings in the frequency and quantity described in those contracts. Landlord must approve the contractor and the frequency and quantity of the cleanings under the contract. Tenant must submit to Landlord a copy of each executed cleaning contract within 30 days after the execution and copies of all documentation verifying that the cleanings required under the contract have occurred within 30 days after the cleaning occurs. Tenant agrees that if Tenant fails to comply with the requirements of this Section 9.5 concerning grease trap cleaning, then Tenant must pay monthly at the same time minimum guaranteed rent is due, as liquidated damages (it being understood and agreed that actual damages would be very difficult to assess, but such liquidated damages are a fair estimate of the actual damages), an amount equal to $500 for each failure to comply with the requirements of this lease concerning grease traps cleaning. The liquidated damages described above do not and cannot be deemed to limit Landlord's rights under Article 22 of this lease.

9.6     Tenant must take good care of the Demised Premises, keep the Demised Premises secure (Tenant acknowledges that it is not relying on any representation or warranty of Landlord in this regard), and keep the Demised Premises free from waste at all times. Tenant must not overload the floors in the Demised Premises, nor deface or injure the Demised Premises. Tenant at all times must keep the Demised Premises neat, clean and free from dirt and rubbish; must take care that dirt, refuse, and garbage from or connected with the Demised Premises does not collect on the sidewalks, service ways and loading areas adjacent to or serving the Demised Premise so any other portion of the Shopping Center; and must keep the sidewalks, service ways and loading areas adjacent to or serving the Demised Premises free from ice and snow. Tenant must store all trash and garbage within the Demised Premises, or in a trash dumpster or other container approved by Landlord as to type, location and screening; and Tenant must arrange for the regular pick-up of such trash and garbage at Tenant's expense (unless Landlord elects to furnish such a service or otherwise arranges for such service to be provided, in which event Landlord will charge Tenant an equitable portion of the total of charges to all tenants using the service). Tenant must receive and deliver goods and merchandise and remove garbage and trash in the frequency, schedule, manner, and areas Landlord prescribes. Tenant must not operate an incinerator or burn trash or garbage within the Shopping Center.

9.7     Tenant must maintain all display windows in a neat, attractive condition, and must keep all display windows, exterior electric signs and exterior lighting under any canopy in front of the Demised Premises lighted from dusk until 11:00 p.m., every day, including Sundays and holidays (or any other hours established by Landlord for the Shopping Center).

9.8     Tenant must include the address and identity of its business activities in the Demised Premises in all advertisements made by Tenant in which the address and identity of any similar local business activity of Tenant is mentioned.

9.9     Tenant must procure at its sole expense any permits and licenses required for the transaction of business in the Demised Premises and otherwise comply with all applicable laws, ordinances and governmental regulations. In addition, if the nature of Tenant's business makes it advisable for Tenant to take any extra precautions (for example, in the case of a business which is affected by so-called "dram shop" laws, Tenant's compliance with all "dram shop" educational programs and procedures), Tenant must take all such extra precautions. At Landlord's request, Tenant must deliver to Landlord copies of all such permits and licenses and proof of Tenant's compliance with all such laws, ordinances, governmental regulations and extra precautions.

## ARTICLE 10

## MAINTENANCE AND REPAIR OF DEMISED PREMISES

10.1     Landlord must keep the Landlord=s Improvements (as defined in Section 16.3 below) in good repair. The provisions of the first sentence of this Section 10.1 are expressly recognized to be subject to the provisions of Article 3, Article 17 and Article 18 of this lease. In the event that the Demised Premises should become in need of repairs required to be made by Landlord hereunder, Tenant must give immediate written notice thereof to Landlord and Landlord will have a reasonable time after receipt by Landlord of such written notice in which to make such repairs.

10.2     Tenant must keep the Demised Premises in good, clean and habitable condition and must at its sole cost and expense keep the Demised Premises free of insects, rodents, vermin and other pests and make all needed repairs and replacements, including replacement of cracked or broken glass, except for repairs and replacements required to be made by Landlord under the provisions of Section 10.1, Article 17 and Article 18. Without limiting the coverage of the previous sentence, it is understood that Tenant's responsibilities therein include the repair and replacement of all lighting, heating and air conditioning (subject to the terms of Section 10.1 above), plumbing and other electrical, mechanical and electromotive installation, equipment and fixtures and also include all utility repairs in ducts, conduits, pipes and wiring, and any sewer stoppage located in any lines which exclusively serve the Demised Premises, regardless of how or where the defect or other cause for repair or replacement occurred or became apparent. If any repairs required to be made by Tenant hereunder are not made within ten days after written notice delivered to Tenant by Landlord or, in the case of a situation which by its nature requires an immediate response or a response within less than ten (10) days, Landlord may at its option make such repairs without liability to Tenant for any loss or damage which may result to its stock or business by reason of such repairs; and Tenant must pay to Landlord upon demand, as additional rent hereunder, the cost of such repairs plus interest at the maximum contractual rate which could legally be charged in the event of a loan of such payment to Tenant (but in no event to exceed 12% per month), such interest to accrue continuously from the date of payment by Landlord until repayment by Tenant. At the expiration of this lease, Tenant must surrender the Demised Premises in good condition, excepting reasonable wear and tear and losses required to be restored by Landlord in Section 10.1, Article 17 and Article 18 of this lease.

10.3     Tenant must contract with a qualified and licensed HVAC contractor who will inspect and maintain such HVAC on a quarterly basis. Tenant must deliver a copy of the contract to Landlord within 30 days after it is executed. Tenant must also provide all inspection reports quarterly. Tenant must carry insurance covering said equipment and must provide proof of insurance satisfactory to Landlord on said equipment upon occupancy.

## ARTICLE 11

## ALTERATIONS

11.1    Tenant must not make any alterations, additions or improvements to the Demised Premises without the prior written consent of Landlord, except for the installation of unattached, movable trade fixtures which may be installed without drilling, cutting or otherwise defacing the Demised Premises. Without limiting the generality of the immediately preceding sentence, any installation or replacement of Tenant's heating or air conditioning equipment must be effected strictly in accordance with Landlord's instructions.

11.2    All construction work done by Tenant within the Demised Premises must be performed in a good and workmanlike manner, lien-free and in compliance with all governmental requirements, and in such manner as to cause a minimum of interference with other construction in progress and with the transaction of business in the Shopping Center. Tenant agrees to indemnify Landlord and hold Landlord harmless against any loss, liability or damage resulting from such work, and Tenant must, if requested by Landlord, furnish a bond or other security satisfactory to Landlord against any such loss, liability or damage.

11.3    In the event Tenant uses a general contractor to perform construction work within the Demised Premises, Tenant must, prior to the commencement of such work, require such general contractor to (a) execute and record a Dual Obligee Bond to Pay Claims, with the obligees being both Landlord and Tenant, issued by a surety company and on a form acceptable to Landlord (the "Payment Bond") in accordance with Chapter 53, Subchapter I of the Texas Property Code, as such may be amended, superseded or replaced from time to time, and must deliver a copy of the recorded Bond to Landlord, and (b) execute and deliver to Landlord a Dual Obligee Performance Bond, with the obligees being both Landlord and Tenant, issued by a surety company and on a form acceptable to Landlord (the Performance Bond @ with the Payment Bond and the Performance Bond sometimes collectively being referred to as the Bonds@). The delivery of the Bonds within the time period set forth above is a condition precedent to Tenant's ability to enter on and begin its construction work at the Demised Premises and, if applicable, to any reimbursement from Landlord for the cost of its construction work.

11.4    In the event that Landlord elects to remodel all or any portion of the Shopping Center, Tenant will cooperate with such remodeling, including Tenant's tolerating temporary inconveniences (and even the temporary removal of Tenant's signs in order to facilitate such remodeling, as it may relate to the exterior of the Demised Premises).

## ARTICLE 12

## LANDLORD'S RIGHT OF ACCESS

12.1    Landlord is entitled to enter upon the Demised Premises at any time for the purpose of inspecting the same, or of showing the Demised Premises to prospective purchasers, tenants or lenders, or of making repairs to the Demised Premises, or of making repairs, alterations or additions to (a) adjacent premises, or (b) the building systems serving the building within which the Demised Premises are located or serving any other tenant premises within such building.

12.2    Tenant will permit Landlord to place and maintain "For Rent" or "For Lease" signs on the Demised Premises during the last 180 days of the lease term, it being understood that such signs in no way affect Tenant's obligations pursuant to Section 9.4, Section 13.1 or any other provision of this lease.

12.3    Use of the roofs in the Shopping Center is reserved to Landlord.

## ARTICLE 13

## SIGNS; STORE FRONTS; AWNINGS

13.1    Tenant agrees to install first-class signage on the Demised Premises on or prior to the Commencement Date and to maintain such signage during the term of this lease. Tenant agrees that if Tenant fails to install or maintain such sign as required in this Section 13.1, then Tenant must pay monthly at the same time minimum guaranteed rent is due, as liquidated damages (it being understood and agreed that actual damages would be very difficult to assess, but such liquidated damages are a fair estimate of the actual damages), an amount equal to fifteen percent (15%) of the minimum guaranteed rent payable for the month (or months) in which Tenant does not have the required signage, or does not have well-maintained signage, on the Demised Premises. The liquidated damages described above do not and cannot be deemed to limit Landlord's rights under Article 22 of this lease. All signage requires prior written approval of Landlord to insure compliance with shopping center standards. Tenant will be responsible for removal of the signage and repair of the affected areas at the termination of Tenant's Lease. If Tenant fails to remove and repair the areas as prescribed herein within 10 days of Lease termination, Landlord can arrange to have signs removed and affected areas repaired. All charges incurred by Landlord in this process plus a $250 administrative fee will be billed to Tenant.

13.2    Tenant must not, without Landlord's prior written consent (a) make any changes to the store front, or (b) install any exterior signs, window or door lettering, placards, or advertising media of any type, lighting, decorations, paintings, awnings, canopies or the like, or (c) erect or install any interior signs, window or door lettering, placards, decorations or advertising media of any type within three feet (3') of any exterior storefront, window, or wall. All signs, lettering, placards, banners, portable signs, decorations and advertising media (including the sign required by Section 13.1 above) must conform in all respects to the sign criteria established by Landlord for the Shopping Center from time to time in the exercise of its sole discretion. All signage (including, without limitation, the signage required by Section 13.1 above) is subject to Landlord's requirements as to construction, method of attachment, size, shape, height, lighting, color and general appearance. Tenant must keep all signs in good condition and in proper operating order at all times.

13.3    Tenant further agrees that if Landlord permits it to install and/or maintain awnings in relation to its business operations at the Demised Premises, such awnings must be of the same design, color, and quality of materials as specified by Landlord for the building in which the Demised Premises are a part; and Tenant further agrees to maintain and keep such awnings in a good state of repair so that they present a first-class appearance at all times. If Tenant fails to maintain, repair, or replace such awnings as deemed necessary by Landlord, it is agreed by both parties hereto that Landlord has the privilege, after giving Tenant ten (10) days' written notice, to order awnings repaired or replaced as is deemed necessary by Landlord, and to charge the cost of same to Tenant, such cost to be added to and considered a part of the next month's rent. Tenant agrees it must not install equipment of any kind on the exterior of the Demised Premises without the prior written approval of Landlord. Tenant will be responsible for removal of their awnings and repair the affected areas at the termination of Tenant's Lease. If Tenant fails to remove the awnings and repair the affected areas as prescribed herein within 10 days of Lease termination, Landlord can arrange to have awnings removed and the affected areas repaired. All charges incurred by Landlord in this process plus a $250 administrative fee will be billed to Tenant.

## ARTICLE 14

## UTILITIES

14.1    Landlord shall in no way be liable or responsible for any loss, damage, or expense that Tenant may sustain or incur by reason of any change, failure, interference, disruption, or defect in the supply or character of the electric energy furnished to the Demised Premises, or if the quantity or character of the electric energy supplied by the Current Electric Service Provider or any Alternate Service Provider is no longer available or suitable for Tenant=s requirements, and no such change, failure, defect, unavailability, or unsuitability shall constitute an actual or constructive eviction, in whole or in part, or entitle Tenant to any abatement or diminution of rent, or relieve Tenant from any of its obligations under the Lease.

14.2    Except as otherwise expressly provided herein, the failure by Landlord to any extent to furnish, or the interruption or termination of these defined services in whole or in part, resulting from adherence to laws, regulations and administrative orders, force majeure or any other causes beyond the reasonable control of Landlord shall not render Landlord liable in any respect nor be construed as an eviction of Tenant, nor work an abatement of rent, nor relieve Tenant from the obligation to fulfill any covenant or agreement hereof. Should any of the equipment or machinery used in the provision of such services for any cause cease to function properly, Landlord shall use reasonable diligence to repair such equipment or machinery but, except as otherwise expressly provided herein, Tenant shall have no claim for offset, abatement of rent or damages or termination of this Lease on account of an interruption in service thereby or resulting therefrom. Except as expressly provided herein, Landlord shall not be required to make any repairs to or maintain the Premises.

14.3    Tenant must promptly pay all charges for electricity, water, gas, telephone service, sewer service and other utilities furnished to the Demised Premises. Landlord may, if it so elects, furnish one or more utility services to Tenant, and in such event Tenant must purchase the use of such services as are tendered by Landlord, and must pay on demand as additional rent the rates established therefor by Landlord which cannot exceed the rates which would be charged for the same services if furnished directly by the local public utility companies. Landlord may at any time discontinue furnishing any such service without obligation to Tenant other than to connect the Demised Premises to the public utility, if any, furnishing such service. In addition, if certain utilities are furnished to the Demised Premises in common with other premises, then Landlord may (a) estimate the amount used by each tenant and bill each tenant accordingly, or (b) install, at Landlord=s expense, a sub-meter, in which event Landlord will bill each tenant for the amount used according to that tenant=s sub-meter. Any amounts Landlord bills to Tenant under the terms of this <u>Section 14.3</u> will be considered additional rent and will be due within thirty (30) days after the date upon which Landlord delivers such bill to Tenant.

14.4    Landlord is not liable for any interruption whatsoever in utility services not furnished by Landlord, nor for interruptions in utility services furnished by Landlord which are due to fire, accident, strike, acts of God or other causes beyond the control of Landlord or which are necessary or useful in connection with making any alterations, repairs or improvements.

## ARTICLE 15

## INSURANCE COVERAGES

15.1    Tenant must, at Tenant=s sole cost and expense, procure and maintain the insurance described below in accordance with the requirements set forth below:

a.    The minimum insurance coverages are as follows:

(i)    Property insurance (the A<u>Tenant=s Property Insurance</u>@) which covers (a) all of Tenant=s personal property in, on, at, or about the Demised Premises, including, without limitation, Tenant=s furniture, trade fixtures, equipment, inventory, and merchandise (collectively, A<u>Tenant=s Personal Property</u>@), and (b) all improvements to the Demised Premises <u>other than</u> the Landlord=s Improvements (as defined in <u>Section 16.3</u> below). Tenant=s Property Insurance must be written on the broadest available Aall-risk@ or Aspecial form@ policy form; must include an agreed-amount endorsement for no less than one hundred percent (100%) of the full replacement cost of the Tenant=s Personal Property and the Tenant=s Improvements (new, without deduction for depreciation); must be written in amounts of coverage that meet any coinsurance requirements of the policy or policies; must include vandalism and malicious mischief coverage and sprinkler coverage; and must name Landlord as an Ainsured as its interest may appear.@

(ii)    Commercial general liability insurance (A<u>Tenant=s Liability Insurance</u>@) written on an Aoccurrence@ policy form, covering Bodily Injury, Property Damage, and Personal Injury (all as defined in <u>Section 16.3</u> below), arising out of or relating, directly or indirectly, to Tenant=s business operations, conduct, assumed liabilities, or use or occupancy of the Demised Premises and any portion of the Tenant Liability Area (as that term is defined in <u>Section 16.3</u> below). Tenant=s Liability Insurance must include the broadest available form of contractual liability coverage. The minimum acceptable limits for Tenant=s Liability Insurance are $1,000,000. Tenant must cause the Landlord Parties (as defined in <u>Section 16.3</u> below) to be named as Aadditional insureds@ by endorsement satisfactory in form and substance to Landlord.

(iii)    Workers= Compensation Insurance and Employer=s Liability Insurance. The minimum acceptable limits for the Worker=s Compensation Insurance are as set forth in the applicable statutes of the State of Texas and for the Employer=s Liability Insurance are $500,000. All such policies must contain waivers of subrogation in favor of Landlord.

(iv)    At all times during which construction work is being performed by or on behalf of Tenant at the Demised Premises, Tenant must maintain ABuilder=s Risk@ insurance, covering the full replacement value of all such work being performed, naming Landlord as an Ainsured as its interest may appear,@ and being written in amounts of coverage that meet any coinsurance requirements of the policy or policies.

b.    The insurance requirements set forth in <u>Section 15.1(a)</u> are independent of Tenant=s waiver, indemnification, and other obligations under this lease and cannot be construed or interpreted in any way to restrict, limit, or modify Tenant=s waiver, indemnifications, and other obligations or to limit in any way Tenant=s liability under this lease. In addition to the requirements set forth in <u>Section 15.1(a)</u>, each insurance company issuing one or more of policies of insurance Tenant is required to carry under this <u>Article 15</u> must have a rating of no less than A-:VIII in the current Best=s Insurance Guide or A- in the current Standard and Poor Insurance Solvency Review and must be admitted to engage in the business of insurance in the State of Texas. The insurance Tenant is required to carry under this lease must be primary insurance for all claims under such insurance and must provide that any insurance carried by the Landlord Parties is strictly excess, secondary, and noncontributing with any insurance carried by Tenant. The insurance Tenant is required to carry under this lease must provide that it cannot be canceled, not renewed, or be subject to a change in coverage or limits of coverage except after thirty (30) days= prior written notice to Landlord and Landlord=s lenders. Tenant is permitted to provide its insurance through a blanket policy as long as Tenant, at Tenant=s sole cost and expense, procures a Aper location@ endorsement, or an equivalent reasonably acceptable to Landlord.

c.    Tenant must deliver to Landlord adequate proof that Tenant is carrying the type and amount of insurance coverage required by this lease before Tenant enters onto the Demised Premises and at any time (but no more than twice per year) upon request from Landlord. Additionally, Tenant must deliver to Landlord, no less than thirty (30) days before the expiration date of any policy, adequate proof that Tenant has obtained renewal or replacement coverage for at least one (1) year immediately following such expiration. While the

following checklist does not override the requirements of the preceding sentences, it is intended to give Tenant a preliminary checklist of the insurance documentation Landlord requires:

- ACORD Form 27 AEvidence of Insurance@ (for Property Insurance, Builder=s Risk Insurance, Commercial General Liability Insurance, Worker=s Compensation Insurance, and Employers= Liability Insurance).
- Copies of all additional insured endorsements (which must be on ISO Form 2026 or an ISO form which replaces such form).
- Copies of all loss payee endorsements.
- Copies of all mortgagee clauses.
- Copies of all waivers of subrogation.

15.2    Landlord must procure and maintain the insurance described below in accordance with the requirements set forth below:

a.    The minimum insurance coverages are as follows:

(i)    Property insurance (ALandlord=s Property Insurance@) covering all of Landlord=s Improvements (as defined in Section 16.3 below). Landlord=s Property Insurance must be written on the broadest available Aall-risk@ or Aspecial form@ policy form; must include an agreed-amount endorsement for no less than one hundred percent (100%) of the full replacement cost of the Landlord=s Improvements (new, without deduction for depreciation); must be written in amounts of coverage that meet any coinsurance requirements of the policy or policies; and must include vandalism and malicious mischief coverage and sprinkler coverage.

(ii)    Commercial general liability insurance (ALandlord=s Liability Insurance@) written on an Aoccurrence@ policy form, covering Bodily Injury, Property Damage and Personal Injury (all as defined in Section 16.3 below) arising out of or relating, directly or indirectly, to Landlord=s business operations, conduct, assumed liabilities, or use or occupancy of the Common Area, with the exception of the Tenant Liability Area. Landlord=s Liability Insurance must include the broadest available form of contractual liability coverage. The minimum acceptable limits for Landlord=s Liability Insurance are $1,000,000.

b.    The insurance requirements set forth in Section 15.2(a) are independent of Landlord=s waiver, indemnification, and other obligations under this lease and cannot be construed or interpreted in any way to restrict, limit, or modify Landlord=s waiver, indemnification, and other obligations or to limit in any way Landlord=s liability under this lease. In addition to the requirements set forth in Section 15.2(a), each insurance company issuing one or more of the insurance policies Landlord is required to carry under this Article 15 must have a rating of no less than A-:VIII in the current Best=s Insurance Guide or A- in the current Standard & Poor Insurance Solvency Review and must be admitted to engage in the business of insurance in the State of Texas. Landlord is permitted to provide its insurance through a blanket policy.

## ARTICLE 16

### WAIVER OF LIABILITY; MUTUAL WAIVER OF SUBROGATION

16.1    To the fullest extent permitted by law, Tenant hereby indemnifies and holds the Landlord Parties (as defined in Section 16.3 below) harmless from and against all Claims (as defined in Section 16.3 below) arising from (i) any Personal Injury, Bodily Injury, or Property Damage (all as defined in Section 16.3 below) whatsoever in the Tenant Liability Area, and (ii) any Bodily Injury to any employee of any Tenant Party (as defined in Section 16.3 below) arising out of and in the course of such employee=s employment (the matters set forth in A(i)@ and A(ii)@ above are referred to in this lease collectively as the AMatters Indemnified by Tenant@ and individually as a AMatter Indemnified by Tenant@). To the fullest extent permitted by law, Tenant, on behalf of all Tenant Parties, waives any and all Claims against the Landlord Parties arising from (i) any of the Matters Indemnified by Tenant, and (ii) any loss or damage to property of a Tenant Party located in the Demised Premises or other part of the Shopping Center by casualty, theft or otherwise. Tenant, at Tenant=s expense, must assume on behalf of the Landlord Parties and conduct with due diligence and in good faith the defense of any Matter Indemnified by Tenant. The defense must be by counsel satisfactory to Landlord, but Landlord agrees not to unreasonably withhold or delay its approval of such counsel. Landlord further agrees to cooperate in Tenant's defense of any action or proceeding brought by a person or entity in connection with any Matter Indemnified by Tenant. Any final settlement by Tenant of any action or proceeding in connection with any Matter Indemnified by Tenant must be approved by Landlord, which approval may not be unreasonably withheld or delayed. Each Landlord Party has the right, at its option, to be represented by advisory counsel of its own selection and at its own expense. In the event of failure by Tenant to fully perform in accordance with this indemnification, each Landlord Party, at its option, and without relieving Tenant of its obligations under this Section 16.1, may so perform, but Tenant must reimburse such Landlord Party for all costs and expenses so incurred, together with interest at the maximum contractual rate permitted at law. Tenant's obligations under this Section 16.1 are not and cannot be deemed to be limited to damages, compensation or benefits payable under insurance policies, worker's compensation acts, disability benefit acts or other employees' benefit acts.

16.2    To the fullest extent permitted by law, Landlord hereby indemnifies and holds Tenant and its successors, assigns, officers, and directors harmless from and against all Claims arising from any Personal Injury, Bodily Injury, or Property Damage whatsoever in the Common Area other than the Tenant Liability Area (the matters so indemnified are referred to in this lease collectively as the AMatters Indemnified by Landlord@ and individually as a AMatter Indemnified by Landlord@). To the fullest extent permitted by law, Landlord, on behalf of all Landlord Parties, waives any and all Claims against Tenant and its successors, assigns, officers, and directors arising from any of the Matters Indemnified by Landlord. Landlord, at Landlord=s expense, must assume on behalf of Tenant and its successors, assigns, officers, and directors and conduct with due diligence and in good faith the defense of any Matter Indemnified by Landlord. The defense must be by counsel satisfactory to Tenant, but Tenant agrees not to unreasonably withhold or delay its approval of such counsel. Tenant further agrees, on behalf of itself and its successors, assigns, officers, and directors, to cooperate in Landlord's defense of any action or proceeding brought in connection with any Matter Indemnified by Landlord. Any final settlement by Landlord of any action or proceeding in connection with any Matter Indemnified by Landlord must be approved by Tenant, which approval may not be unreasonably withheld or delayed. Each of the parties so indemnified by Landlord has the right, at its option, to be represented by advisory counsel of its own selection and at its own expense. In the event of failure by Landlord to fully perform in accordance with this indemnification, Tenant, at its option, and without relieving Landlord of its obligations under this Section 16.2, may so perform, but Landlord must reimburse Tenant for all costs and expenses so incurred, together with interest at the maximum contractual rate permitted at law. Landlord=s obligations under this Section 16.2 are not and cannot be deemed to be limited to damages, compensation or benefits payable under insurance policies, worker's compensation acts, disability benefit acts or other employees' benefit acts.

16.3    The following terms have the following definitions:

ABodily Injury,@ APersonal Injury,@ and AProperty Damage@ have the same meanings as in the standard form of commercial general liability insurance policy.

AClaims@ means any and all liabilities, claims, damages (including, consequential damages), losses, penalties, demands, causes of action (whether in tort or contract, in law or at equity, or otherwise), suits, judgments, disbursements, charges, assessments, and

expenses (including attorneys= and experts= fees and expenses) incurred in investigating, defending, or prosecuting any litigation, claim, proceeding, or cause of action (whether in tort or contract, in law or at equity, or otherwise).

A@Landlord=s Improvements@ means the foundation, roof, and structural portion of exterior walls of the buildings in the Shopping Center, but does not include plate glass; windows, doors, and other exterior openings; window and door frames; molding, closure devices, locks, and hardware; special store fronts; lighting, heating, air conditioning, plumbing and other electrical, mechanical, and electromotive installations; equipment and fixtures; signs, placards, decorations, or other advertising media of any type; or interior painting or other interior treatment of exterior walls. The purpose of this definition is to establish certain maintenance, repair, replacement, and insurance obligations of Landlord and so this definition may not have any relationship whatsoever to the Landlord=s Work, as that term is defined in Exhibit AC@ attached to and made a part of this lease for all purposes.

A@Landlord Parties@ means (a) Landlord, Landlord's partners, affiliated companies of Landlord or of any partner of Landlord, (b) Landlord's lenders, and (c) as to each of the persons or entities listed in "(a)" and "(b)" above, the following persons or entities: such person or entity's partners, partners of their partners, and any successors, assigns, heirs, personal representatives, devisees, agents, stockholders, officers, directors, employees, and affiliates. A@Landlord Party@ means any one of the Landlord Parties.

A@Tenant=s Improvements@ means all improvements to the Demised Premises and, to the extent made by or on behalf of Tenant, means all improvements to the Tenant Liability Area. The purpose of this definition is to establish certain maintenance, repair, replacement, and insurance obligations of Tenant and so this definition may not have any relationship whatsoever to the Tenant=s Work, as that term is defined in Exhibit AC@ attached to and made a part of this lease for all purposes.

A@Tenant=s Liability Area@ means the Demised Premises, the service ways and loading area adjacent to or serving the Demised Premises, and any portion of the Common Area to which Tenant makes alterations or in which Tenant conducts any portion of its business (although the reference to such activities within the Common Area can in no way be deemed to constitute Landlord=s consent to such activities).

A@Tenant Parties@ means (a) Tenant itself, (b) any contractor of Tenant, (c) the employees of Tenant or of any contractor of Tenant, (d) any person that Tenant or any contractor of Tenant's controls or exercises control over, (e) any invitee of Tenant, (f) any licensee of Tenant, (g) subtenants of Tenant, (h) as to each of the persons or entities listed in "(a)" through and including "(g)" above, the following persons: such person or entity's partners, partners of their partners, and all successors, assigns, heirs, personal representatives, devisees, agents, stockholders, officers, directors, employees, and affiliates of such parties. A@Tenant Party@ means any one of the Tenant Parties.



16.4    Except as set forth in the next-succeeding sentence, the indemnities and waivers contained in Section 16.1 apply regardless of the active or passive negligence or sole, joint, concurrent, or comparative negligence of the Landlord Parties and regardless of whether liability without fault or strict liability is imposed or sought to be imposed on any of the Landlord Parties. If the final judgment of a court of competent jurisdiction establishes, under the principles of comparative negligence in the State of Texas, that the gross negligence or willful misconduct of a Landlord Party proximately caused a percentage of the damage suffered by a third party, then, as to such percentage only, the indemnities and waivers contained in Section 16.1 will not apply to such Landlord Party, but will apply to any damage in excess of such percentage and to all of the other Landlord Parties. Except as set forth in the next-succeeding sentence, the indemnities and waivers contained in Section 16.2 apply regardless of the active or passive negligence or sole, joint, concurrent, or comparative negligence of the Tenant Parties and regardless of whether liability without fault or strict liability is imposed or sought to be imposed on any of the Tenant Parties. If the final judgment of a court of competent jurisdiction establishes, under the principles of comparative negligence in the State of Texas, that the gross negligence or willful misconduct of a Tenant Party proximately caused a percentage of the damage suffered by a third party, then, as to such percentage only, the indemnities and waivers contained in Section 16.2 will not apply to such Tenant Party, but will apply to any damage in excess of such percentage and to all of the other Tenant Parties.

16.5    Landlord and Tenant each hereby release the other from any and all liability or responsibility to the other, or to any other party claiming through or under them by way of subrogation or otherwise, for any loss or damage to property caused by a casualty which is insurable under standard Aall risk@ or Aspecial form@ or similar property insurance and agree to obtain an endorsement to that effect in their respective Aall risk@ or Aspecial form@ or similar property insurance policies; provided, however, that this mutual waiver and agreement is applicable only with respect to a loss or damage occurring during the time when Aall risk@ or Aspecial form@ or similar property insurance policies which are readily available in the marketplace contain a clause or permit an endorsement to the effect that any such release does not adversely affect or impair the policy or the right of the insured party to receive proceeds under the policy; provided, further, that this release is not applicable to the portion of any damage which is not reimbursed by the damaged party's insurer because of the "deductible" in the damaged party's insurance coverage. The release specified in this Section 16.5 is cumulative with any releases or exculpations which may be contained in other provisions of this lease.

## ARTICLE 17

## DAMAGES BY CASUALTY

17.1    Tenant must give immediate written notice to the Landlord of any damage caused to the Demised Premises by fire or other casualty.

17.2    In the event that the Demised Premises are damaged or destroyed by fire or other casualty insurable under standard Aall risk@ or Aspecial form@ or similar property insurance, Landlord agrees to deliver to Tenant, within ninety (90) days after Tenant delivers to Landlord the written notice required by the terms of Section 17.1 above, a realistic construction schedule, prepared by a reputable general contractor selected by Landlord, setting forth such general contractor=s estimated time periods to substantially complete the repair and reconstruction that Landlord would be required to complete under Section 17.4 below if neither Landlord or Tenant terminates this lease (the AConstruction Schedule@). If the Construction Schedule indicates that such work will be completed after the expiration of the applicable time period set forth below, then either Landlord or Tenant may terminate this lease by written notice to the other at any time within thirty (30) days after Landlord delivers the Construction Schedule to Tenant: (i) for partial damage or destruction to the Demised Premises, one hundred twenty (120) days after the date upon which such work commences, (ii) for total destruction of the Demised Premises where no other portion of the Shopping Center is damaged or destroyed, one hundred eighty (180) days after the date upon which such work commences, and (iii) for total destruction of the Demised Premises where any other portion of the Shopping Center is damaged or destroyed, one year after the date upon which such work commences. If Landlord or Tenant terminates this lease as set forth above, then

such termination will be effective on the date such notice is delivered to the other party. If Landlord or Tenant fails to terminate this lease in the manner set forth above, then such party will be deemed to have waived the termination right set forth in this <u>Section 17.2</u> and if they both fail to do so, they both will be deemed to have waived the termination right set forth in this <u>Section 17.2</u>.

17.3    In the event the Demised Premises are damaged or destroyed by fire or other casualty that is not insured under standard Aall risk@ or Aspecial form@ or similar property insurance, then Landlord may terminate this lease by written notice to Tenant. In the event the Demised Premises are damaged or destroyed by fire or other casualty, and neither Landlord nor Tenant is entitled to terminate this lease in accordance with <u>Section 17.2</u> above or is entitled to terminate this lease but does not do so and the holder of any mortgage, deed of trust or other lien senior to this lease elects under the terms of its security documents to apply all or any portion of the insurance proceeds to the reduction of Landlord's indebtedness, then Landlord may terminate this lease within sixty (60) days after Landlord delivers the Construction Schedule to Tenant. Any termination under this <u>Section 17.3</u> will be effective on the date such notice is delivered to Tenant. If Landlord fails to terminate this lease in the manner set forth above, then Landlord will be deemed to have waived the termination right unde r this <u>Section 17.3</u>.

17.4    Landlord's obligation to rebuild and repair under this <u>Article 17</u> is in any event limited to restoring the Landlord=s Improvements (as defined in <u>Section 16.3</u> above). Should Landlord fail to substantially complete such repair and restoration within the applicable time period set forth in the Construction Schedule, then Tenant may, as its sole and exclusive remedy, terminate this lease by written notice to Landlord at any time after the end of the applicable time period but before the earlier to occur of ten (10) days after the end of the applicable time period or the date of substantial completion of such repair and restoration. If Tenant fails to term inate this lease in the manner set forth above, then Tenant will be deemed to have waived the termination right under this <u>Section 17.4</u>. Tenant agrees that promptly after completion of such work by Landlord, Tenant will proceed with reasonable diligence and at Tenant's sole cost a nd expense to restore, repair and replace the Tenant=s Personal Property and the Tenant=s Improvements (as defined in <u>Section 16.3</u> above).

17.5    Tenant agrees that during any period of reconstruction or repair of the Demised Premises, it will continue the operation of its business within the Demised Premises to the extent practicable. During the period from the occurrence of any casualty at the Demised Premises until Landlord's required repairs are completed, the minimum guaranteed rent will be reduced to such extent as may b e fair and reasonable under the circumstances.

## ARTICLE 18

### EMINENT DOMAIN

18.1    If more than thirty percent (30%) of the floor area of the Demised Premises should be taken for any public or quasi -public use under any governmental law, ordinance or regulation or by right of eminent domain or by priva te purchase in lieu thereof, this lease will terminate, effective on the date physical possession is taken by the condemning authority.

18.2    If less than thirty percent (30%) of the floor area of the Demised Premises should be taken as aforesaid, this lease will not terminate; however, the minimum guaranteed rent (but not percentage rent) payable hereunder during the unexpired portion of this lease will be reduced in proportion to the area taken, effective on the date physical possession is taken by the co ndemning authority. Following such partial taking, Landlord must make all necessary repairs or alterations to the remaining Demised Premises or, if an exhibit d escribing Landlord's Work is attached to this lease, all necessary repairs within the scope of Landlord's Work as described in such exhibit, as the case may be, required to make the remaining portions of the Demised Premises an architectural whole.

18.3    If any part of the Common Area should be taken as aforesaid, this lease will not terminate, nor will the rent payable under this lease be reduced, except that either Landlord or Tenant may terminate this lease if the area of the Common Area remaini ng following such taking plus any additional parking area provided by Landlord in reasonable proximity to the Shopping Center is less than seventy percent of the area of the Common Area immediately prior to the taking. Any election to terminate this lease in accordance w ith this provision must be evidenced by written notice of termination delivered to the other party within thirty days after the date physical possession is taken by the condemning authority.

18.4    All compensation awarded for any taking (or the proceeds of private sale in lieu thereof) of the Demised Premises or Common Area is the property of Landlord, and Tenant hereby assigns its interest in any such award to Landlord; provided, however, Landlord has no interest in any award made to Tenant for Tenant's moving and relocation expenses or for the loss of Tenant's fixtures and other tangible personal property if a separate award for such items is made to Tenant, as long as such separate award does not reduce the amount of the award that would otherwise be awarded to Landlord.

## ARTICLE 19

### ASSIGNMENT AND SUBLETTING

19.1    <u>**ASSIGNMENT**</u>.

a.    <u>**Consent of LANDLORD**</u>. Except as specifically provided in this Article 19, Tenant may not assign this Lease, without the prior written consent of Landlord, which consent may not be unreasonably withheld or denied. Any transfer of Ten ants interest in this Lease or the Demised Premises by operation of law, regardless of whether the same is characterized as voluntary or involuntary, shall be construed as an "assignment" governed by this Section. Landlord's written consent to any one assignment shall not act as a waiver of the requirements of consent with respect to any subsequent assignment.

b.    <u>**Assumption and Release**</u>. Upon a permitted assignment under this Article 19, the assignee shall assume all rights and obligations of Tenant under this Lease. Any assignee of Tenant shall deliver to Landlord an assumption agreement in a form reasonably satisfactory to Landlord no less than ten (10) days after the effective date of the proposed assignment. Notwithstanding such approved assignment, Tenant shall remain liable under this Lease unless otherwise released in writing by Landlord.

c.    <u>**Consent Criteria**</u>. Landlord shall not withhold its consent to an assignment by Tenant so long as the proposed assignee (i) agrees in writing to be bound by all of the terms and conditions contained herein, including, specifically, the Permitted Use clause; (ii) demonstrates, to Landlord's reasonable satisfaction, prior experience in operating the Permitted use; and (iii) demonstrates, to Landlord's reasonable satisfaction, adequate financial resources to meet the obligations of Tenant under this Lease.

19.2    <u>**SUBLETTING**</u>.

a.    <u>**Consent of LANDLORD**</u>. Except as specifically provided in this Article 19, Tenant may not sublet all or a ny portion of the Demised Premises, without the prior written consent of Landlord, which consent may not be unreasonably withheld or denied subject to the provisions below. Upon such permitted subletting, the sublessee shall agree to comply with all obligations of Tenant under this Lease relating to the area subleased. Further, Landlord's written consent to any one subletting shall not act as a waiver of the requirements

of consent with respect to any subsequent subletting. Notwithstanding such approved subletting, Tenant shall remain liable under this Lease unless otherwise released in writing by Landlord.

b. **Consent Criteria**. Landlord shall not withhold its consent to a subletting by Tenant so long as the proposed subtenant (i) agrees in writing to be bound by all of the terms and conditions contained herein, including, specifically, the Permitted use clause; and (ii) demonstrates to Landlord's reasonable satisfaction, financial resources to meet the obligations of Tenant under this Lease.

c. **Sublease Rent**. In the event that the rent due and payable by a sublessee (or a combination of the rent payable under such sublease plus any bonus or other consideration therefor or incident thereto) exceeds the rent payable under this lease, then Tenant is bound and obligated to pay Landlord all such excess rent and other excess consideration within ten (10) days following receipt thereof by Tenant from such sublessee. It is understood and agreed that Tenant will receive all rents paid to Tenant by a sublessee in trust for Landlord, to be forwarded immediately to Landlord without offset or reduction of any kind; and upon election by Landlord such sublessee must pay all rents directly to Landlord as specified in Article 4 of this lease (to be applied as a credit and offset to Tenant's rent obligation).

19.3    **TRANSACTIONS WITH AFFILIATES.**  Notwithstanding any contrary provision of this Article 19, Landlord's consent shall not be necessary for any assignment or subletting to any person or entity (i) which is a parent, subsidiary or affiliate of Tenant; (ii) with which or into which Tenant has merged or consolidated; or (iii) which acquires all, substantially all or a majority of Tenant's assets in the state in which the Demised Premises is located. For purposes of this Section 19.3, an "affiliate" of a person or entity shall mean any other person or entity which controls, is controlled by, or is under common control with such person or entity.

19.4    In the event of the transfer and assignment by Landlord of its interest in this lease and in the building containing the Demised Premises to a person expressly assuming Landlord's obligations under this lease, Landlord will thereby be released from any further obligations hereunder, and Tenant agrees to look solely to such successor-in-interest of Landlord for performance of such obligations. Any security given by Tenant to secure performance of Tenant's obligations hereunder may be assigned and transferred by Landlord to such successor-in-interest and Landlord will thereby be discharged of any further obligation relating thereto.

## ARTICLE 20

### SUBORDINATION; ATTORNMENT; ESTOPPELS

20.1    Tenant accepts this lease subject and subordinate to any mortgage, deed of trust or other lien presently existing or hereafter placed upon the Shopping Center or any portion of the Shopping Center which includes the Demised Premises, and to any renewals and extensions thereof. Tenant agrees that any mortgagee has the right at any time to subordinate its mortgage, deed of trust or other lien to this lease; provided, however, notwithstanding that this lease may be (or be made to be) superior to a mortgage, deed of trust or other lien, the mortgagee will not be liable for prepaid rents, security deposits and claims accruing during Landlord's owner ship; further provided that the provisions of a mortgage, deed of trust or other lien relative to the rights of the mortgagee with respect to proceeds arising from an eminent domain taking (including a voluntary conveyance by Landlord) and provisions relative to proceeds arising from insurance payable by reason of damage to or destruction of the Demised Premises will be prior and superior to any contrary provisions contained in this instrument with respect to the payment or usage thereof. Landlord is hereby irrevocably vested with full power and authority to subordinate this lease to any mortgage, deed of trust or other lien hereafter placed upon the Demised Premises or the Shopping Center as a whole, and Tenant agrees upon demand to execute such further instruments subordinating this lease as Landlord may request; provided, however, that upon Tenant's written request and notice to Landlord, Landlord must use good faith efforts to obtain from any such mortgagee a written agreement that after a foreclosure (or a deed in lieu of foreclosure) the rights of Tenant will remain in full force and effect during the term of this lease so long as Tenant recognizes and performs all of the covenants and conditions of this lease.

20.2    At any time when the holder of an outstanding mortgage, deed of trust or other lien covering Landlord's interest in the Demised Premises has given Tenant written notice of its interest in this lease, Tenant may not exercise any remedies for default by Landlord hereunder unless and until the holder of the indebtedness secured by such mortgage, deed of trust or other lien has received written notice of such default and a reasonable time (not less than 30 days) has thereafter elapsed without the default having been cured.

20.3    Tenant agrees that it will from time to time upon request by Landlord execute and deliver to Landlord a written statement addressed to Landlord (or to a party designated by Landlord), which statement must identify Tenant and this lease, must certify that this lease is unmodified and in full force and effect (or if there have been modifications, that the same is in full force and effect as so modified), must confirm that Landlord is not in default as to any obligations of Landlord under this lease (or if Landlord is in default, specifying any default), must confirm Tenant's agreements contained above in this Article 20, and must contain such other information or confirmations as Landlord may reasonably require. Landlord is hereby irrevocably appointed and authorized as the agent and attorney-in-fact of Tenant to execute and deliver any such written statement on Tenant's behalf if Tenant fails to do so within seven (7) days after the delivery of a written request from Landlord to Tenant.

## ARTICLE 21

### DIRECTION OF TENANT'S ENERGIES

21.1    Tenant acknowledges that Tenant's monetary contribution to Landlord (in the form of rents) and Tenant's general contribution to commerce within the Shopping Center (also important in Landlord's determination to execute this lease with Tenant) will be substantially reduced if during the term of this lease, either Tenant or any person, firm or corporation, directly or indirectly controlling, controlled by or under common control with Tenant directly or indirectly operates, manages, or has any interest in any establishment within commercial proximity of the Shopping Center. Accordingly, Tenant agrees that if during the term of this lease, either Tenant or any person, firm or corporation, directly or indirectly controlling, controlled by or under common control with Tenant (and also, in the event Tenant is a corporation, if any officer or director thereof or shareholder owning more than ten percent (10%) of the outstanding stock thereof, or parent, subsidiary or related or affiliated corporation) either directly or indirectly commences operation of, manages, or has any interest in any commercial establishment selling or offering for sale any merchandise or services of the type to be sold by Tenant in the Demised Premises as provided in Section 1.1(u) hereof or similar or related items, or in any manner competes with the business provided herein to be conducted by Tenant at the Demised Premises, within a straightline radius of five (5) miles of the Shopping Center, which Tenant acknowledges is a reasonable area for the purpose of this provision, then in such event, the rent payable by Tenant hereunder will be adjusted as follows:

(a)    thereafter the minimum guaranteed rent will be one hundred ten percent (110%) of the amount stipulated in Section 1.1(n) of this lease.

The above adjustment in rent reflects the estimate of the parties as to the damages which Landlord would be likely to incur by reason of the diversion of business and customer traffic from the Demised Premises and Shopping Center to such other store within such radius, as a proximate result of the establishment of such other store.  This provision does not apply to any existing store presently being operated by Tenant as of the date of this lease, provided there is no increase in the size, merchandise mix or trade name of such commercial establishment.  Finally, Tenant agrees that Landlord may waive, for any reason whatsoever, all rights granted to Landlord pursuant to this

Section 21.1 and may sever this section from the remainder of this lease (thereby keeping the remainder of this lease unmodified and in full force and effect).

## ARTICLE 22

### DEFAULT BY TENANT AND REMEDIES

22.1    The following events will be deemed to be events of default by Tenant under this lease:

(a)    Tenant fails to pay any installment of rent or any other obligation under this lease involving the payment of money and such failure continues for a period of ten (10) days after written notice thereof to Tenant; provided, however, that for any twelve (12)-month period during which Landlord has already given Tenant one written notice of the failure to pay an installment of rent, no further notice will be required (i.e., the event of default will automatically occur on the tenth day after the date upon which the rent was due).

(b)    Tenant fails to comply with any provision of this lease, other than as described in Subsection (a) above, and either does not cure such failure within fifteen (15) days after written notice thereof to Tenant, or cures that particular failure but again fails to comply with the same provision of this lease within three months after Landlord's written notice.

(c)    Tenant or any guarantor of Tenant's obligations under this lease becomes insolvent, or makes a transfer in fraud of creditors, or makes an assignment for the benefit of creditors.

(d)    Tenant or any guarantor of Tenant's obligations under this lease files a petition under any section or chapter of the federal Bankruptcy Code, as amended, or under any similar law or statute of the United States or any state thereof; or Tenant or any guarantor of Tenant's obligations under this lease is adjudged bankrupt or insolvent in proceedings filed against Tenant or any guarantor of Tenant's obligations under this lease thereunder.

(e)    A receiver or Trustee is appointed for the Demised Premises or for all or substantially all of the assets of Tenant or any guarantor of Tenant's obligation under this lease.

(f)    Tenant deserts or vacates or commences to desert or vacate the Demised Premises or any substantial portion of the Demised Premises or at any time prior to the last month of the lease term removes or attempts to remove, without the prior written consent of Landlord, all or a substantial amount of Tenant's goods, wares, equipment, fixtures, furniture, or other personal property.

(g)    Tenant does or permits to be done anything which creates a lien upon the Demised Premises or upon all or any part of the Shopping Center.

(h)    Tenant makes an anticipatory breach of this lease. The term "anticipatory breach" means either (a) Tenant's repudiation of this lease in writing, or (b) the combination of (i) Tenant's desertion or vacation or commencement of desertion or vacation of the Demised Premises or removal of all or a substantial amount of Tenant's goods, wares, equipment, fixtures, furniture, or other personal property from the Demised Premises, and (ii) Tenant's failure to pay any minimum guaranteed rent or other amounts due under this lease as and when they are due and payable.

22.2    Upon the occurrence of any such events of default, Landlord has the option to pursue any one or more of the following remedies:

(a)    Without any further notice or demand whatsoever, Landlord may enter upon and take possession of the Demised Premises and expel or remove Tenant and any other person who may be occupying the Demised Premises or any part of the Demised Premises, by force, if necessary (except to the extent prohibited by Texas law), without being liable for prosecution or any claim for damages for such action. Such expulsion and removal by Landlord cannot be deemed a termination or forfeiture of this lease or acceptance of Tenant's surrender of the Demised Premises unless Landlord expressly notifies Tenant in writing that Landlord is terminating or forfeiting this lease or accepting Tenant's surrender of the Demised Premises. If Landlord expels or removes Tenant and any other person from the Demised Premises without terminating or forfeiting this lease or accepting surrender of the Demised Premises, Landlord must attempt to mitigate its damages. In any situation in which Landlord is attempting to mitigate its damages, Landlord will conclusively be deemed to have done so if Landlord lists the Demised Premises with a real estate broker or agent (which may be affiliated with Landlord) and considers all written proposals for such space made by such broker or agent; provided, however, that in no event will Landlord (i) be obligated to travel outside a radius of thirty (30) miles from its principal office in order to meet with a prospective tenant, (ii) be obligated to expend monies for finish-out requested by a prospective tenant unless Landlord, in its sole discretion, believes that the excess rent Landlord will receive and the credit of the prospective tenant support such a decision, (iii) be required to give preference to the Demised Premises over other spaces in the Shopping Center, (iv) be required to agree to allow an existing tenant of the Shopping Center to move from their existing space to all or any of the Demised Premises, (vi) be obligated to accept any lease proposal whose terms are less advantageous than then-current market, or (vii) be required to accept any lease proposal which it, in its sole discretion, deems unacceptable. In attempting to relet or actually reletting the Demised Premises, Landlord will be free to enter into a direct lease with the proposed replacement tenant and will not be acting as Tenant's agent, although the proceeds Landlord actually receives for any time period will be credited against Tenant's obligations for the same time period. Tenant will not be entitled to any additional credit (for example, if Landlord receives amounts during a particular time period in excess of Tenant's obligations for the same time period, Landlord will not be required to credit such excess against Tenant's obligations for any other time period). Until Landlord is able, through such efforts, to relet the Demised Premises, Tenant must pay to Landlord, on or before the first day of each calendar month, in advance, the monthly rents and other charges provided in this lease. At such time, if any, as Landlord relets the Demised Premises, Tenant must pay to Landlord on the 20th day of each calendar month the difference between the monthly rents and other charges provided in this lease for such calendar month and the amount actually collected by Landlord for such month from the occupant to whom Landlord has re-let the Demised Premises. If it is necessary for Landlord to bring suit in order to collect any deficiency, Landlord has the right to allow such deficiencies to accumulate and to bring an action on several or all of the accrued deficiencies at one time. Any such suit cannot prejudice in any way the right of Landlord to bring a similar action for any subsequent deficiency or deficiencies.

(b)    Without any further notice or demand whatsoever, Landlord may terminate this lease by written notice to Tenant, in which event Tenant must immediately surrender the Demised Premises to Landlord, and if Tenant fails to do so, Landlord may, without prejudice to any other remedy which Landlord may have for possession or arrearages in rent (including any late charge or interest which may have accrued pursuant to Section 4.7 of this lease), enter upon and take possession of the Demised Premises and expel or remove Tenant and any other person who may be occupying the Demised Premises or any part thereof, by force, if necessary (except to the extent prohibited by Texas law), without being liable for prosecution or any claim for damages therefor. If the event of default pursuant to which Landlord terminated this lease was a default under Section 22(a) or Section 22.1(h) above, then to the fullest extent permitted by applicable law, Tenant hereby agrees to pay the difference between the total of all monthly rents and other charges provided in this lease for the remainder of the term and the reasonable rent value of the Demised Premises for such period, such difference to be discounted to then-present value at a rate equal to the rate of interest which is allowed by law in the State of Texas when the parties to a contract have not agreed on any particular rate of interest (or, in the absence of such law, at the rate of six percent per annum).

(c)    Without any further notice or demand whatsoever, Landlord may pursue the following remedies for the following specific defaults:

        (i)      In the event of any default described in <u>Subsection 22.1(b)</u> of this lease, Landlord has the right to enter upon the Demised Premises, by force, if necessary (except to the extent prohibited by Texas law), without being liable for prosecution or any claim for damages therefor, and do whatever Tenant is obligated to do under the terms of this lease; and Tenant agrees to reimburse Landlord on demand for any expenses which Landlord may incur in thus effecting compliance with Tenant's obligations under this lease, and Tenant further agrees that Landlord will not be liable for any damages resulting to the Tenant from such action.

        (ii)      In the event of any default described in <u>Subsection 22.1(g)</u> of this lease, Landlord may pay or bond around such lien, whether or not contested by Tenant; and in such event Tenant agrees to reimburse Landlord on demand for all costs and expenses incurred in connection with any such action, with Tenant further agreeing that Landlord is in no event liable for any damages or claims resulting from such action.

If Landlord elects to exercise the remedy prescribed in <u>Subsection 22.2(a) or 22.2(c)</u> above, this election in no way prejudices Landlord's right at any time thereafter to cancel such election in favor of the remedy prescribed in <u>Subsection 22.2(b)</u> above, provided that at the time of such cancellation Tenant is still in default. Pursuit of any of the above remedies does not preclude pursuit of any other remedies prescribed in other sections of this lease and any other remedies provided by law or in equity. Forbearance by Landlord to enforce one or more of the remedies herein provided upon an event of default cannot be deemed or construed to constitute a waiver of such default. No agreement to accept a surrender of the Demised Premises and no act or omission by Landlord or Landlord's agent during the term of this lease will constitute an acceptance of surrender of the Demised Premises unless made in writing and signed by Landlord. Similarly, no reentry or taking of possession of the Demised Premises by Landlord will constitute an election by Landlord to terminate this lease unless a written notice of such intention, signed by Landlord, is given to Tenant.

     22.3      It is expressly agreed that in determining "the monthly rents and other charges provided in this lease," as that term is used throughout <u>Subsection 22.2</u> above, there will be added to the minimum guaranteed rent (as specified in <u>Section 1.1(n)</u> of this lease) a sum equal to the charges for maintenance and operation of the Common Area (as specified in <u>Sections 1.1(p) and 7.4</u> of this lease) and the payments for real estate charges and insurance expenses (as specified in <u>Article 6</u> of this lease) plus one twenty-fourth of the total of all percentage rents required to be paid by Tenant (pursuant to <u>Section 4.4</u> of this lease) because of gross sales during the two full calendar years immediately preceding the date Landlord initiated action pursuant to such subsections (or, if two full calendar years have not then elapsed, to the corresponding fraction of all percentage rents required to be paid because of gross sales during the period commencing with the Commencement Date of this lease and concluding with the date on which Landlord initiated such action). It is further understood and agreed that the phrase "without any further notice or demand whatsoever," as that term is used throughout <u>Section 22.2</u> above, incorporates Tenant's full, final, and complete waiver of all demands and notices permitted or required by applicable law, whether statutory or common law, and in equity (including, without limitation, any statutory requirement of prior written notice for filing eviction or damage suits for nonpayment of rent), it being understood and agreed that if any notice is appropriate, it is provided for in <u>Section 22.1</u>.

     22.4      It is further agreed that, in addition to payments required pursuant to <u>Section 22.2</u> above, Tenant must compensate Landlord for all expenses incurred by Landlord in repossession (including, among other expenses, any increase in insurance premiums caused by the vacancy of the Demised Premises), all expenses incurred by Landlord in reletting (including, among other expenses, repairs, remodeling, replacements, advertisements and brokerage fees), all concessions granted to a new tenant upon reletting (including, among other concessions, renewal options), all losses incurred by Landlord as a direct or indirect result of Tenant's default (including, among other losses, any adverse reaction by Landlord's mortgagee or by other tenants or potential tenants of the Shopping Center) and a reasonable allowance for Landlord's administrative efforts, salaries and overhead attributable directly or indirectly to Tenant's default and Landlord's pursuing the rights and remedies provided herein and under applicable law.

     22.5      Landlord may restrain or enjoin any breach or threatened breach of any covenant, duty or obligation of Tenant herein contained without the necessity of proving the inadequacy of any legal remedy or irreparable harm. The remedies of Landlord hereunder are deemed cumulative and not exclusive of each other.

     22.6      If on account of any breach or default by Tenant in its obligations hereunder, Landlord employs an attorney to present, enforce or defend any of Landlord's rights or remedies hereunder, Tenant agrees to pay any reasonable attorney's fees incurred by Landlord in such connection.

     22.7      In the event that Tenant fails to pay any rent or other amounts due under this lease, or in the event any one or more provisions of this <u>Article 22</u> authorizes Landlord to enter the Demised Premises, Landlord is entitled and is hereby authorized, without any notice to Tenant, to enter upon the Demised Premises by use of a duplicate key, a master key, a locksmith's entry procedures or any other means not involving personal confrontation, and to alter or change the door locks on all entry doors of the Demised Premises, thereby permanently excluding Tenant. In such event Landlord will not be obligated to place any written notice on the Demised Premises explaining Landlord's action; moreover, if a reason for Landlord's action is the failure of Tenant to pay any one or more rents when due pursuant to this lease, Landlord will not be required to provide the new key (if any) to Tenant until and unless all rent defaults of Tenant have been fully cured.

     22.8      Tenant acknowledges its obligation to deposit with Landlord the sum stated in <u>Section 1.1(t)</u> above, to be held by Landlord without interest as security for the performance by Tenant of Tenant's covenants and obligations under this lease. Tenant agrees that such deposit may be co-mingled with Landlord's other funds and is not an advance payment of rent or a measure of Landlord's damages in case of default by Tenant. Upon the occurrence of any event of default by Tenant, Landlord may, from time to time, without prejudice to any other remedy provided herein or provided by law, use such fund to the extent necessary to make good any arrears of rents and any other damage, injury, expense or liability caused to Landlord by such event of default, and Tenant must pay to Landlord on demand the amount so applied in order to restore the security deposit to its original amount. If Tenant is not then in default hereunder, any remaining balance of such deposit will be returned by Landlord to Tenant upon termination of this lease (subject to the provisions of <u>Section 19.6</u> above).

     22.9      In the event of any default described in <u>Subsection (d) of Section 22.1</u> of this lease, Tenant acknowledges that the Project constitutes a shopping center@ for the purposes of the Bankruptcy Code and therefore acknowledges and agrees that any assumption and assignment must conform with the requirements of the Bankruptcy Code which provides, in part, that the Landlord must be provided with adequate assurance (i) of the source of rent and other consideration due under this lease; (ii) that the financial condition and operating performance of any proposed assignee and its guarantors, if any, is similar to the financial condition and operating performance of Tenant and its guarantors, if any, as of the date of execution of this lease; (iii) that any percentage rent due under this lease will not decline substantially; (iv) that any assumption or assignment is subject to all of the provisions of this lease (including, but not limited to, restrictions as to use) and will not breach any such provision contained in any other lease, financing agreement or other agreement relating to the Shopping Center; and (v) that any assumption or assignment will not disrupt any tenant mix or balance in the Shopping Center.

        (a)      In order to provide Landlord with the assurance contemplated by the Bankruptcy Code, Tenant must fulfill the following obligations, in addition to any other reasonable obligations that Landlord may require, before any assumption of this lease is effective: (i) all defaults under <u>Subsection (a) of Section 22.1</u> of this lease must be cured within ten (10) days after the date of assumption; (ii) all other defaults under <u>Section 22.1</u> of this lease other than under <u>Subsection (d) of Section 22.1</u> must be cured within fifteen (15) days after the date of assumption; (iii) all actual monetary losses incurred by Landlord (including, but not limited to, reasonable attorneys fees) must be paid to Landlord within ten (10) days after the date of assumption; and (iv) Landlord must receive within ten (10) days after the date of assumption a security deposit in the amount of six (6) months minimum guaranteed rent (using the minimum guaranteed rent in effect for the

first full month immediately following the assumption) and an advance prepayment of minimum guaranteed rent in the amount of three (3) months minimum guaranteed rent (using the minimum guaranteed rent in effect for the first full month immediately following the assumption), both sums to be held by Landlord in accordance with Section 22.8 above and deemed to be rent under this lease for the purposes of the Bankruptcy Code as amended and from time to time in effect.

(b)     In the event this lease is assumed in accordance with the requirements of the Bankruptcy Code and this lease, and is subsequently assigned, then, in addition to any other reasonable obligations that Landlord may require and in order to provide Landlord with the assurances contemplated by the Bankruptcy Code, Landlord must be provided with (i) a financial statement of the proposed assignee prepared in accordance with generally accepted accounting principles consistently applied, though on a cash basis, which reveals a net worth in an amount sufficient, in Landlord's reasonable judgment, to assure the future performance by the proposed assignee of Tenant's obligations under this lease; or (ii) a written guaranty by one or more guarantors with financial ability sufficient to assure the future performance of Tenant's obligations under this lease, such guaranty to be in form and content satisfactory to Landlord and to cover the performance of all of Tenant's obligations under this lease.

## ARTICLE 23

### LANDLORD'S CONTRACTUAL SECURITY INTEREST

23.1     In addition to the statutory Landlord's lien, Landlord has at all times a valid security interest to secure payment of all rents and other sums of money becoming due hereunder from Tenant, and to secure payment of any damages or loss which Landlord may suffer by reason of the breach by Tenant of any covenant, agreement or condition contained herein, upon all goods, wares, equipment, fixtures, furniture, improvements and other personal property of Tenant presently, or which may hereafter be, situated on the Demised Premises, and all proceeds therefrom, and such property must not be removed without the consent of Landlord until all arrearages in rent as well as any and all other sums of money then due to Landlord or to become due to Landlord hereunder first have been paid and discharged and all the covenants, agreements and conditions hereof have been fully complied with and performed by Tenant. Upon the occurrence of an event of default by Tenant, Landlord may, in addition to any other remedies provided herein, enter upon the Demised Premises and take possession of any and all goods, wares, equipment, fixtures, furniture, improvements and other personal property of Tenant situated on the Demised Premises, without liability for trespass or conversion, and sell the same at public or private sale, with or without having such property at the sale, after giving Tenant reasonable notice of the time and place of any public sale or of the time after which any private sale is to be made, at which sale the Landlord or its assigns may purchase unless otherwise prohibited by law. Unless otherwise provided by law, and without intending to exclude any other manner of giving Tenant reasonable notice, the requirement of reasonable notice will be met if such notice is given in the manner prescribed in this lease at least five days before the time of sale. Any sale made pursuant to the provisions of this paragraph will be deemed to have been a public sale conducted in a commercially reasonable manner if held in the above-described Demised Premises or where the property is located after the time, place and method of sale and a general description of the types of property to be sold have been advertised in a daily newspaper published in the county in which the property is located, for five consecutive days before the date of the sale. The proceeds from any such disposition, less any and all expenses connected with the taking of possession, holding and selling of the property (including reasonable attorney's fees and legal expenses), will be applied as a credit against the indebtedness secured by the security interest granted in this paragraph. Any surplus will be paid to Tenant or as otherwise required by law; the Tenant must pay any deficiencies forthwith. Tenant hereby agrees that a carbon, photographic or other reproduction of this lease is sufficient to constitute a financing statement. Tenant nevertheless agrees that upon request by Landlord, Tenant will execute and deliver to Landlord a financing statement in form sufficient to perfect the security interest of Landlord in the aforementioned property and proceeds thereof under the provision of the Uniform Commercial Code (or corresponding state statute or statutes) in force in the state in which the property is located, as well as any other state the laws of which Landlord may at any time consider to be applicable; moreover, Landlord is hereby irrevocably vested with a power of attorney from Tenant to execute any and all such financing statements on behalf of Tenant.

23.2     Notwithstanding Section 23.1, Landlord agrees that it will subordinate its security interest and landlord's lien to the security interest of Tenant's supplier or institutional financial source for as long as the rent account of Tenant under this lease is current (or is brought current), provided that Landlord approves the transaction as being reasonably necessary for Tenant's operations at the Demised Premises, and further provided that the subordination must be limited to a specified transaction and specified items of the fixtures, equipment or inventory involved in the transaction.

## ARTICLE 24

### HOLDING OVER; SURRENDER OF PREMISES

24.1     In the event Tenant remains in possession of the Demised Premises after the expiration of this Lease and without the execution of a new lease, it will be deemed to be occupying the Demised Premises as a tenant at sufferance at a daily rent equal to the rent (including any percentage rent) herein provided plus fifty percent of such amount, pro-rated on a daily basis, otherwise subject to all the conditions, provisions and obligations of this Lease insofar as the same are applicable to a tenancy at sufferance.

24.2     At the end of the term or the termination of Tenant's right to possess the Demised Premises, Tenant must (1) deliver to Landlord the Demised Premises with all improvements located thereon in good repair and condition, reasonable wear and tear (subject however to Tenant's maintenance obligations) excepted, (2) deliver to Landlord all keys to the Demised Premises, and (3) remove all signage placed on the Demised Premises. All fixtures, alterations, additions, and improvements (whether temporary or permanent) are Landlord's property and must remain on the Demised Premises except as provided in the next two sentences. Provided that Tenant has performed all of its obligations hereunder, Tenant may remove all unattached trade fixtures, furniture, and personal property placed in the Demised Premises by Tenant (but Tenant cannot remove any such item which was paid for, in whole or in part, by Landlord). Additionally, Tenant must remove such alterations, additions, improvements, fixtures, equipment, wiring, furniture, and other property as Landlord may request, provided such request is made within six months after the end of the term. All items not so removed will, at the option of Landlord, be deemed abandoned by Tenant and may be appropriated, sold, stored, destroyed, or otherwise disposed of by Landlord without notice to Tenant and without any obligation to account for such items, and Tenant must pay for the costs incurred by Landlord in connection therewith. Any such disposition cannot be considered a strict foreclosure or other exercise of Landlord's rights in respect of the security interest granted under Article 23. All work required of Tenant under this Section 24.2 must be coordinated with Landlord and be done in a good and workmanlike manner, in accordance with all laws, and so as not to damage the Demised Premises or the Shopping Center. Tenant must, at its expense, promptly repair all damage caused by any work performed by Tenant under this Section 24.2.

## ARTICLE 25

### NOTICES

25.1     Wherever any notice is required or permitted under this lease, such notice must be in writing. Any notice or document required or permitted to be delivered under this lease will be deemed to be delivered when actually received by the designated addressee or,

if earlier and regardless of whether actually received or not, when deposited in the United States mail, postage prepaid, certified mail, return receipt requested, or when sent by messenger or private overnight courier (but not facsimile), addressed to the applicable party at such party=s address as set forth in Section 1.1 above, or such other address as such party has previously specified by written notice.

     25.2    If and when included within the term "Landlord" as used in this instrument there are more than one person, firm or corporation, all must jointly arrange among themselves for their joint execution of such notice specifying some individual at some specific address for the receipt of notices and payments to the Landlord; if and when included within the term "Tenant" as used in this instrument there are more than one person, firm or corporation, all must jointly arrange among themselves for their joint execution of such a notice specifying some individual at some specific address for the receipt of notices and payment to Tenant. All parties included within the terms "Landlord" and "Tenant," respectively, are bound by notices and payments given in accordance with the provisions of this Article to the same effect as if each had received such notice or payment. In addition, Tenant agrees that notices to Tenant may be given by Landlord's attorney, property manager or other agent.

## ARTICLE 26

Intentionally Deleted

## ARTICLE 27

### AMERICANS WITH DISABILITIES ACT

     27.1    Landlord represents that the Common Area was constructed in accordance with the requirements of the Americans With Disabilities Act of 1990, as amended from time to time, and related state and municipal laws and regulations (collectively, the "ADA") as they existed at the time Landlord constructed the Shopping Center. However, Landlord's sole obligation and responsibility in the event such representation is not true is to cause the Common Area to comply with the requirements, as such requirements have been modified or limited. If there are any changes to the ADA which require changes to the Common Area, Landlord will improve the Common Area of the Shopping Center in order to comply with the ADA. All costs incurred by Landlord in complying with the terms of the immediately-preceding sentence may be included as Common Area expenses pursuant to and in accordance with the terms of Section 7.4 of this lease.

     27.2    Tenant is responsible for compliance with the ADA in all matters regarding both the configuration of the Demised Premises (the interior as well as all public and/or employee door entrances) and Tenant's business operations at the Demised Premises.

## ARTICLE 28

### REGULATIONS

     28.1    Landlord and Tenant acknowledge that there are in effect federal, state, county and municipal laws, orders, rules, directives and regulations (collectively referred to hereinafter as the "Regulations") and that additional Regulations may hereafter be enacted or go into effect, relating to or affecting the Demised Premises or the Shopping Center, and concerning the impact on the environment of construction, land use, maintenance and operation of structures, toxic or otherwise hazardous substances, and conduct of business. Subject to the express rights granted to Tenant under the terms of this lease, Tenant will not cause, or permit to be caused, any act or practice, by negligence, omission or otherwise, that would adversely affect the environment, or do anything or permit anything to be done that would violate any of the Regulations. Moreover, Tenant has no claim against Landlord by reason of any changes Landlord may make in the Shopping Center or the Demised Premises pursuant to the Regulations or any charges imposed upon Tenant, Tenant's customers or other invitees pursuant to same.

     28.2    If, by reason of any Regulations, the payment to, or collection by, Landlord of any rent or other charge (collectively referred to hereinafter as "Lease Payments") payable by Tenant to Landlord pursuant to the provisions of this lease is in excess of the amount (the "Maximum Charge") permitted thereof by the Regulations, then Tenant, during the period (the "Freeze Period") when the Regulations are in force and effect will not be required to pay, nor will Landlord be permitted to collect, any sum in excess of the Maximum Charge. Upon the earlier of (i) the expiration of the Freeze Period, or (ii) the issuance of a final order or judgment of a court of competent jurisdiction declaring the Regulations to be invalid or not applicable to the provisions of this lease, Tenant, to the extent not then proscribed by law, and commencing with the first day of the month immediately following, must pay to Landlord as additional rent, in equal monthly installments during the balance of the term of this lease, a sum equal to the cumulative difference between the Maximum Charges and the Lease Payments during the Freeze Period. If any provisions of this section, or the application thereof, are to any extent declared to be invalid and unenforceable, the same will not be deemed to affect any of the other provisions of this section or of this lease, all of which is to be deemed valid and enforceable to the fullest extent permitted by law.

## ARTICLE 29

### MISCELLANEOUS

     29.1    Nothing in this lease can be deemed or construed by the parties hereto, nor by any third party, as creating the relationship of principal and agent or of partnership or of joint venture between the parties hereto, it being understood and agreed that neither the method of computation of rent, nor any other provision contained herein, nor any acts of the parties hereto, will be deemed to create any relationship between the parties hereto other than the relationship of landlord and tenant.

     29.2    Tenant must not for any reason withhold or reduce Tenant's required payments of rents and other charges provided in this lease, it being agreed that the obligations of Landlord under this lease are independent of Tenant's obligations except as may be otherwise expressly provided. The immediately preceding sentence cannot be deemed to deny Tenant the ability of pursuing all rights granted it under this lease or at law; however, as contemplated in Rule 174(b) of the Texas Rules of Civil Procedure (as such may be amended from time to time), at the direction of Landlord, Tenant's claims in this regard will be litigated in proceedings different from any litigation involving rent claims or other claims by Landlord against Tenant (i.e., each party may proceed to a separate judgment without consideration, counterclaim or offset as to the claims asserted by the other party).

     29.3    The liability of Landlord to Tenant for any default by Landlord under the terms of this lease will be limited to the proceeds of sale on execution of the interest of Landlord in the Demised Premises; and Landlord will not be personally liable for any deficiency, except that Landlord will, subject to the provisions of Section 19.6 hereof, remain personally liable to account to Tenant for any security deposit under this lease. This clause cannot be deemed to limit or deny any remedies which Tenant may have in the event of default by Landlord hereunder which do not involve the personal liability of Landlord.

     29.4    In all circumstances under this lease where the prior consent of one party (the "consenting party"), whether it be Landlord or Tenant, is required before the other party (the "requesting party") is authorized to take any particular type of action, such party must not withhold such consent in a wholly unreasonable and arbitrary manner; however, the requesting party agrees that its exclusive remedy if it

believes that consent has been withheld improperly (including, but not limited to, consent required from Landlord pursuant to Section 9.2 or Section 19.1) is to institute litigation either for a declaratory judgment or for a mandatory injunction requiring that such consent be given (with the requesting party hereby waiving any claim for damages, attorneys fees or any other remedy unless the consenting party refuses to comply with a court order or judgment requiring it to grant its consent).

29.5    One or more waivers of any covenant, term or condition of this lease by either party cannot be construed as a waiver of a subsequent breach of the same covenant, term or condition. The consent or approval by either party to or of any act by the other party requiring such consent or approval cannot be deemed to waive or render unnecessary consent to or approval of any subsequent similar act.

29.6    Whenever a period of time is herein prescribed for action to be taken by Landlord, Landlord will not be liable or responsible for, and there will be excluded from the computation of any such period of time, any delays due to strikes, riots, acts of God, shortages of labor or materials, war, governmental laws, regulations or restrictions or any other causes of any kind whatsoever which are beyond the reasonable control of Landlord.

29.7    If any provision of this lease is held to be invalid or unenforceable, the validity and enforceability of the remaining provisions of this lease will not be affected thereby.

29.8    The laws of the State of Texas govern the interpretation, validity, performance and enforcement of this lease. Venue for any action under this lease is in Tarrant County, Texas.

29.9    The captions used herein are for convenience only and do not limit or amplify the provisions hereof.

29.10    Whenever herein the singular number is used, the same includes the plural, and words of any gender include each other gender.

29.11    The terms, provisions and covenants contained in this lease apply to, inure to the benefit of and bind the parties hereto and their respective heirs, successors in interest and legal representatives except as otherwise herein expressly provided.

29.12    This lease contains the entire agreement between the parties, and no rights are created in favor of either party other than as specified or expressly contemplated in this lease. No brochure, rendering information or correspondence will be deemed to be a part of this agreement unless specifically incorporated herein by reference. In addition, no agreement will be effective to change, modify or terminate this lease in whole or in part unless such is in writing and duly signed by the party against whom enforcement of such change, modification or termination is sought.

**29.13    LANDLORD AND TENANT HEREBY ACKNOWLEDGE THAT THEY ARE NOT RELYING UPON ANY BROCHURE, RENDERING, INFORMATION, REPRESENTATION OR PROMISE OF THE OTHER, OR OF THE AGENT OR COOPERATING AGENT, EXCEPT AS MAY BE EXPRESSLY SET FORTH [PLACE AN "X" OR OTHER MARK DESIGNATING A CHOICE IN THE APPROPRIATE BOX]:**

☒    IN THIS LEASE.

☐    IN _____ AS WELL AS IN THIS LEASE.

29.14    Except for Amy Nott with CBRE., Tenant and Landlord represent and warrant to each other that neither has had any contacts or engaged in any actions which would give rise to any claim from any broker in connection with the negotiation or execution of this lease. Tenant and Landlord hereby indemnify each other from and against any and all claims for brokers' commissions relating to the negotiation or execution of this lease and alleged to be due because of an agreement of the indemnifying party.

29.15    This lease consists of twenty-nine articles and Exhibits "A" through "B". With the exception of Article 7, in the event any provision of an exhibit or other attached page is inconsistent with a provision in the body of the lease, the provision as set forth in the exhibit controls.

29.16    Pursuant to Article 1.1 (n), the first six months of the Lease will require zero Minimum Guaranteed Rent. However, the Tenant's proportionate share of common area maintenance charges, property tax escrows and insurance will begin on the Commencement Date and continue thereafter for the duration of the Lease.

29.17    Landlord agrees to reimburse Tenant for expenses incurred in the installation of the bathroom in the Demised Premises up to a maximum of forty three thousand dollars ($43,000.00). Landlord will make reimbursement payment to Tenant within thirty (30) days of request by Tenant, provided Tenant has submitted supporting documents which include vendor invoices, payment verification, lien waivers from all contractors employed at the Demised Premises and approved Certificate of Occupancy from the City of Arlington.

EXECUTED as of the latest date accompanying a signature by Landlord or Tenant below.

ATTEST or WITNESS

LANDLORD:    Danbury Partners, Ltd

By: _____

Printed Name:    Paul L. Buller

Title:  President, LL&B Resources, Inc. General Partner

Date of Signature:    9/24/20

Taxpayer Identification No.    74 - 6415259

TENANT:    Texas Holdings Firm Corporation

ATTEST or WITNESS

By:_____

Printed Name:_____

Title:_____

Date of Signature: 8 / 1 / 20

Taxpayer Identification No. 85-1575484

## EXHIBIT "A"

**Texas Holdings Firm Corporation Lease for Carriage Plaza Shopping Center, Arlington, TX**

Legal Description

BEING a tract of land situated in the WILLIAM O'NEAL SURVEY, ABSTRACT NO. 1190 in the City of Arlington, Tarrant County, Texas, and being all of Lot 1-R and Lot 3-R of the Sanford-Yates Subdivision, an addition to the City of Arlington, according to the Map or Plat thereof recorded in Volume 388-139 at Page 30 of the Plat Records of Tarrant County, Texas and being more particularly described by metes and bounds as follows:

BEGINNING at a chiseled "X" set for the easterly corner of a corner clip at the intersection of the east line of N. Collins Street (F.M. 157) (a variable width right-of-way) with the south line of Copeland Road (a variable width right-of-way), said point also being on the most northerly northwest corner of the above mentioned Sanford-Yates Subdivision;

THENCE along the south line of Copeland Road and the north line of said Sanford-Yates Subdivision the following:

North 89 deg. 51 min. East for a distance of 120.09 feet to a chiseled "X" set for the point of curvature of a curve to the left having a radius of 515.75 feet, a central angle of 10 deg. 00 min. 00 sec., a chord bearing of North 84 deg. 51 min. East and a chord distance of 89.90 feet;

Along said curve to the left, an arc length of 90.02 feet to a 1/2 inch iron rod set for the point of reverse curvature of a curve to the right having a radius of 571.50 feet, a central angle of 10 deg. 00 mm. 00 sec, a chord bearing of North 84 deg. 51 min. East and a chord distance of 99.62 feet;

Along said curve to the right, an arc length of 99.75 feet to a chiseled "X" set for the point of tangency of said curve;

North 89 deg. 51 min. East passing at a distance of 243.56 feet, the north common corner of the above mentioned Lots 1-R and 3-R, continuing in all, a distance of 375.56 feet to a 1/2 inch iron rod found for the northeast corner of said Sanford-Yates Subdivision;

THENCE South 00 deg. 22 min. West, along the east line of said Sanford-Yates Subdivision, for a distance of 415.47 feet to a chiseled "Y" found for the southeast corner of said Subdivision, said point also being on the north line of Dalby Acres Addition, an addition to the City of Arlington, according to the Map or Plat thereof recorded in Volume 388-F at Page 129 of the Plat Records of Tarrant County, Texas;

THENCE North 89 deg. 52 min. West, along the south line of said Sanford-Yates Subdivision and the north line of said Dalby Acres Addition passing at 344.86 feet the south common corner of the above mentioned Lots 1-R and 3-R continuing in all a distance of 404.86 feet to a 5/8 inch iron rod found for the most southerly southwest corner of said Sanford-Yates Subdivision;

THENCE North 00 deg. 08 min. East, departing the north line of said Dalby Acres Addition and continuing along the south line of said Sanford-Yates Subdivision for a distance of 205.00 feet to a chiseled "X" found for a corner;

THENCE North 89 deg. 52 min. West for a distance of 302.50 feet to a PK nail found for the most westerly southwest corner of said Sanford-Yates Subdivision, same being on the east line of the above mentioned N. Collins Street (F.M. 157), said point bears South 89 deg. 52 min. East, 1.30 feet from a found chiseled "X";

THENCE North 04 deg. 32 mm. 30 sec. East, along the west line of said Sanford-Yates Subdivision and the east line of said N. Collins Street (F.M. 157), for a distance of 181.08 feet to a chiseled "X" set for the westerly corner of the above mentioned corner clip at the intersection of the west line of said N. Collins Street (F.M. 157) with the south line of said Copeland Road;

THENCE North 47 deg. 11 min. 45 sec. East, along the corner clip, for a distance of 14.71 feet to the POINT OF BEGINNING;

CONTAINING 5.179 acres or 225,608.66 square feet of land, more or less.

## EXHIBIT "B"

### Texas Holdings Firm Corporation Lease for Carriage Plaza Shopping Center, Arlington, TX

Demised Premises



# FIRST AMENDMENT TO LEASE AGREEMENT

THIS FIRST AMENMENT TO LEASE AGREEMENT (this "First Amendment") is made and entered into this _____ day of June, 2021, by and between Danbury Partners, Ltd, a Texas Limited Partnership ("Landlord") and Texas Holdings Firm Corporation, a Colorado Corporation ("Tenant").

### WITNESSETH:

A. Landlord and Tenant heretofore entered into that certain Lease Agreement dated August 24, 2020 ("the Lease"), pursuant to the terms of which Landlord leased to Tenant and Tenant leased from Landlord those certain Demised Premises ("Premises") situated within the city of Arlington, County of Tarrant, Texas, being a part of a shopping center commonly known as Carriage Plaza Shopping Center, all as more particularly described in the Lease.

B. Lease provides that Tenant shall install bathroom in the Demised Premises and Landlord will reimburse Tenant for the cost of the bathroom installation up to a maximum of $43,000. As an accommodation to the Tenant, Landlord has installed the bathroom in the Demised Premises at its sole cost and expense.

C. Landlord and Tenant desire to document their agreement with respect to the foregoing and amend certain provisions of the Lease as more particularly provided hereafter.

Now, therefore, in consideration of the mutual covenants contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1. All capitalized terms utilized in this First Amendment, unless otherwise provided for herein, shall have the meanings ascribed to them in the Lease.

2. Lease Commencement Date defined in Article 1.1(l) shall be established as June 1, 2021.

3. Tenant accepts the Demised Premises "AS IS" in its condition on June 1, 2021. Tenant acknowledges and accepts the bathroom as provided on June 1, 2021.

4. Landlord has fulfilled its obligation under Article 29.17 of the Lease and has no further liability or obligation to reimburse Tenant for any past or future improvement work or expense.

5. Under the terms of the Lease, Tenant is provided six (6) months of free Minimum Guaranteed Rent beginning on the Commencement Date. Pursuant to Article 1.1 (n), Minimum Guaranteed Rent in the amount of $4,327/month will commence on December 1, 2021. The Minimum Guaranteed Rent provisions of Article 1.1 (n) are not amended.

First Amendment to Lease Agreement
Texas Holdings Firm Corporation
Page 2

6. Landlord agrees to abate Tenant's proportionate share of common area maintenance charges, property tax escrows and insurance for the months of June and July, 2021. Tenant's proportionate share of common area maintenance charges, property tax escrows and insurance will begin August 1, 2021.

7. Except as expressly amended hereby, all terms and provisions of the Lease (to the extent not inconsistent herewith or not modified hereby) shall remain in full force and effect, and Landlord and Tenant do hereby ratify, confirm and adopt the Lease, as amended hereby.

8. This First Amendment shall become effective only upon execution and delivery by both Landlord and Tenant.

Executed as of the date set forth above.


LANDLORD

Danbury Partner, Ltd

By: LL&B Resources, Inc
    General Partner

By: _____
Name: _____PAul Buller_____
Title: _____President_____


TENANT

Texas Holdings Firm Corporation

By: _____
Name: _____Bob Cole William___
Title: _____Cat of Opr_____